J. R. STRAYHORN ET AL V. RUTH LEGETT JONES ET AL.

No. A-5871. Decided March 6, 1957.
Rehearing Overruled April 24, 1957.
(300 S.W. 2d Series 623)

138

*Sayles & Sayles, McMahon, Springer, Smart & Walter* and *Hudson Smart,* all of Abilene, *Lester Whipple,* of San Antonio, *Adkins, Folley, McConnel & Hankins,* and *A. J. Folley,* all of Amarillo, for J. R. Strayhorn et al, and *John Ben Shepperd,* former Attorney General and *Burnell Waldrep,* former assistant Attorney General, *Will Wilson,* Attorney General, *James H. Rogers* and *Milton Richardson,* Assistants Attorney General, for State of Texas, petitioners.

*Wagstaff, Harwell, Alvis & Pope, R. M. Wagstaff, J. Henry Doscher, Jr.,* and *James H. Hand,* all of Abilene, for Ruth Jones and others; *Ratliff, Conner & Walker* and *L. D. Ratliff,* all of Spur, for Frank Stewart; *Fountain, Cox & Gaines* and *Joyce Cox,* of Houston for Gulf Producing Co.; *Shank, Dedman & Paine,* of Dallas, for Lamar Hunt; *Erwin, Wagner & Hodson, Willard B. Wagner, Jr., Williams, Lee & Kennerly* and *Jesse J. Lee,* all of Houston, for Maggie and Horace Wood and the Superior Oil Company; *Harry G. Dippel,* of Fort Worth, for Continental Oil Co.; *Morris Watson,* of Rotan, *W. M. Streetman, Richard F. Bruns* and *Andrew, Kurth, Campbell & Bradley* all of Houston, for General Crude Oil Co.; *Vinson, Elkins, Weems & Searls, Tarlton Morrow, A. D. Rice, Ben H. Rice, III,* all of Houston, for Wrightsman and Crawford; *Stubbeman, McRae & Sealy* and *W. B. Browder, Jr.,* of Midland, for R. G. Maden, Jr., and Kewanee Oil Co.; *Childers & Childers,* for Joe E. Childers, all respondents.

MR. JUSTICE GRIFFIN delivered the opinion of the Court.

This was an action in trespass to try title filed in the District Court of Kent County, Texas, by Ruth Legett Jones and other plaintiffs. The pleadings of Ruth Legett Jones and other plaintiffs put in issue the title to about 141.27 acres of land in Sections 1, 3 and 5 of the John Rodman Survey in Kent County, Texas, most of which land is located in the bed of the Salt Fork of the Brazos River. All parties stipulated that this river was a navigable stream under Article 5302, Vernon's Annotated Texas Civil Statutes. A group of intervenors, who aligned themselves with the plaintiff, put in issue the title to all of Sections 3 and 5 of the south one-half of Section 1 of the Rodman Survey. The State of Texas, as intervenor, put in issue the portion of the Salt Fork of the Brazos River located in Section 1, 3 and 5 of the John Rodman. The original plaintiffs (respondents) and the intervenors aligned with them plead the statutory action of trespass to try title and adverse possession and title by limita-

tion under the three, five and ten year statutes. The intervenors additionally plead the twenty-five year statute.

Title to a small tract of land located in Sections 1 and 3, John Rodman, was also sought to be recovered by plaintiffs, Ruth Legett Jones et al. Various parties holding oil, gas and other mineral leases under plaintiffs and intervenors also intervened seeking to establish their respective interests in the lands sued for.

In the trial on the merits defendants did not file a cross action, but stood on their plea of not guilty and general denial. The evidence showed the entire controversy to be over 239 or more acres of land in Sections 1, 3 and 5 and that such land was in the bed of the Salt Fork of the Brazos River and in tracts contiguous to the river. The case was tried before a jury who returned a verdict, and judgment was rendered by the court in favor of the plaintiffs and intervenors (respondents) and against the defendants and the State of Texas.

Defendants duly filed a motion for instructed verdict, a motion to disregard certain findings of the jury, a motion for judgment non obstante veredicto, and a motion and an amended motion for a new trial; all of which were overruled, and defendants perfected their appeal to the Court of Civil Appeals for the Seventh Supreme Judicial District of Texas, which court affirmed the judgment of the trial court. 289 S.W. 2d 321. Defendants Strayhorn et al applied for and were granted a writ of error to the judgment of the Court of Civil. Appeals.

All parties will be designated as they appeared in the trial court. We will first dispose of the claim urged by the State of Texas that there is an excess of approximately 19 acres above the 640 acres patented in each of Sections 1, 3 and 5, John Rodman; that such excess is in the bed of the Salt Fork River and that the State is the owner of such excess as the sovereign of the soil and by virtue of the provisions of Section 2, Article 5414a, Vernon's Annotated Texas Civil Statutes, commonly known and hereinafter referred to as the "Small Bill." Generally speaking, the Small Bill confirmed and ratified title to the patentees, awardees and their assigns of patents which had been issued and outstanding for a period of ten years prior to March 3, 1929 which was the effective date of the Small Bill, and which patents had not been cancelled or forfeited; and which patents and awards were to lands lying across or partly across water courses or navigable streams, and including the beds of such

navigable streams. The Salt Fork of the Brazos River was included within the field notes of Sections 1, 3 and 5, John Rodman, as patented. We have attached to our opinion a sketch of the lands, including the river bed which is the subject of this litigation. The Small Bill, Section 2, provides, among other things

that "* * * nor shall [this Act] relinquish or quitclaim any number of acres of land in excess of the number of acres of land conveyed to said patentees or awardees in the original patents granted by the State, * * * ." If there is any acreage above 640 acres ·(including the acreage in the river bed) in any of Sections 1, 3 and 5, then the State is entitled to recover such excess acreage. Heard v. Town of Refugio, 129 Texas 349, 103 S.W. 2d 728, 734 (7). It is the contention of plaintiffs that there is no more than 640 acres, including the river bed, in any one of the

three sections; that, in fact, each section has less than 640 acres, and therefore the State is not entitled to recover any land at all.

The Rodman Block is a junior block to the adjoining blocks on the north, east and south. The Rodman consists of 13 sections, and the field notes for each, as well as the patents issued on each, call for a tract of land 1900 varas square, and totaling 640 acres. Applications to purchase Sections 1 to 10, inclusive, in the Rodman Survey were dated July 12, 1882, and the applications to purchase Sections 11 to 13, inclusive, were dated July 18, 1882. Louis C. Wise surveyed all 13 sections of the Rodman as one piece of work. The field notes for each of the 13 sections were issued on the same day in 1882, and in 1884 patents were issued for each section calling for 640 acres of land. The total acreage patented was 8320 acres, and payment was made by the patentees for a total of 8320 acres. A resurvey of the Rodman Block established a conflict between the Rodman on the south and east with a senior block of surveys. As a result, it was determined that the Rodman, as it was located on the ground, contained only 7454.6 acres of land creating an actual deficit of 865.4 acres between what was patented and paid for by the patentees and their assigns and what was actually received. It was stipulated that the northwest corner of Section 12, H. & G. N. Ry. Co., Block 1, was an original corner. This corner is also the southeast corner of Section 1, Block 2, H. & G. N. Ry. Co. and is the southwest corner of Section 13, Block 1, H. & G. N. Ry. Co. Wise begins his field notes of the 13 Rodman sections at this corner, which he calls for as the northeast corner of Section 1, John Rodman, and from this corner builds the 13 sections. Throughout the whole of the Rodman block all the sections are tied together and each section is dependent for its location on the section immediately preceding it. That section, in turn, is dependent upon the section which precedes it. Although as many as nine different surveys had been made by various surveyors in later years not one surveyor found any of the Wise corners or lines on the ground except the one all parties stipulated to be an original corner and being the northeast corner of Section 1, Rodman. Some of the surveyors, attempting to reconstruct Wise's work, prepared field notes that showed an excess of 19 acres in each of Sections 1, 3 and 5, Rodman, and it is upon this testimony that the State relies for recovery. This excess is accounted for by the fact that the later surveyors made the north and south boundary lines of each of these three sections approximately 1955 varas in length. The length of these lines was arrived at because the corners established on the ground by these later surveyors showed the distance between the southeast and

southwest corners of Section 1, Block 2, H. & G. N. Ry. Co. and of Section 12, Block 1, H. & G. N. Ry. Co. to be approximately 1955 varas. Since Wise's original field notes for the Rodman Sections 1 and 5 called for adjoiner with the above sections, and also called for the southeast and southwest corners of the sections in the H. & G. N. Ry. Co. Blocks 1 and 2 the State seeks to extend the north lines of Sections 1 and 5, Rodman, to a distance of 1955 varas. This would cause an excess of approximately 19 acres in Sections 1 and 5, Rodman.

The State's contention is that these later surveys, although none of the original Wise corners of the Rodman were found on the ground, show, as a matter of law, that excess acreage actually exists in Sections 1, 3 and 5. The south boundary lines of Sections 1, 3 and 5 would be extended a corresponding amount because the Wise field notes place the southeast and southwest corners of these sections at 1900 varas south of their respective northeast and northwest corners. The testimony of all surveyors shows that the north boundary line of Section 1, John Rodman, is a common line with the south boundary line of Section 1, Block 2, H. & G. N. Ry. Co., and the north boundary line of Section 5, John Rodman, is a common line with the south boundary line of Section 12, Block 1, H. & G. N. Ry. Co. The field notes and patent to Section 1, Rodman, begin at the southeast corner of Section 1, Block 2, H. & G. N. Ry. Co. (the only original corner found and which corner was stipulated by all parties) ; thence south 1900 varas to a stake and pile of rocks (not found by any surveyor testifying) ; thence west 1900 varas to stake in prairie; thence north 1900 varas to southwest corner of Section 1, Block 2, H. & G. N. Ry. Co.; thence east 1900 varas to place of beginning. This makes the northeast and northwest corners of Section 1, John Rodman, common corners with the southeast and southwest corners of Section 1, Block 2, H. & G. N. Ry. Co. as these corners then existed. We have examined the original field notes of Section 1, Block 2, H. & G. N. Ry. Co. prepared on June 13, 1873 by Wm. Nelson and these field notes call for the south line of Section 1, Block 2, H. & G. N. Ry. Co. to be 1900 varas long. In other words, they place the southwest corner 1900 varas west of the southeast corner. Since none other than the original monument made by Wise for the northeast corner of Section 1, John Rodman, which is also the southeast corner of Section 1, Block 2, H. & G. N. Ry. Co. and the corner stipulated by all parties, was found, (nor were found any others of the original corners on the south Block lines of H. & G. N. Ry. Co. Blocks 1 and 2) the above evidence supports the jury finding that the north boundary of Section 1, Rodman, was only 1900 varas long. All

of the corners found on the south block lines of H. & G. N. Ry. Co. Blocks 1 and 2 were put in by Surveyor Williams in 1902 and later. The original field notes of the Rodman show that the southeast and southwest corners of Section 1, John Rodman, are 1900 varas apart and thus the south boundary line of Section 1, John Rodman, would be only 1900 varas long as called for in Wise's field notes, in the patent and as found by the jury. The Wise field notes and the patent to Section 3, John Rodman, call for the south boundary line of Section 1, John Rodman and the north boundary line of Section 3, John Rodman, to be a common line and only 1900 varas long, as was found by the jury. The evidence supports the findings of the jury that Sections 1 and 3, John Rodman, as originally surveyed by Wise and as patented and as then located on the ground, contained only the 640 acres called for. Therefore, there was and is no excess land within the limits of these surveys to be recovered by the State.

Section 5, John Rodman lies immediately south of Section 12, Block 1, H. & G. N. Ry. Co. The field notes for Section 5, John Rodman begin at the northeast corner of Section 3, John Rodman, also the southwest corner of Section 12, Block 1, H. & G. N. Ry. Co. and the northwest corner of Section 5 and call for each of its boundaries to be 1900 varas long. The call for the east boundary line of Section 5 begins at its southeast corner, "thence north 1900 vrs. to the S.E. corner Sec. No. 12, Block 1, H. &. G. N. R. R. Co.; Thence West 1900 vrs. to the place of beginning." This makes the north corners (northeast and northwest) of Section 5 common corners with south corners (southeast and southwest) of Section 12, Block 1, H. & G. N. Ry. Co. and the calls make the north line of Section 5, John Rodman, which is common with the south line of Section 12, Block 1, H. & G. N. Ry. Co., only 1900 varas long and the common corners 1900 varas apart. We have examined the original field notes of Section 12, Block 1, H. & G. N. Ry. Co., prepared by Wm. Nelson on June 6, 1873, and the corrected field notes prepared by Louis C. Wise on May 1, 1882, and find that each set of field notes calls for the south boundary line of Section 12, Block 1, H. & G. N. Ry. Co. to be 1900 varas from its southwest corner to its southeast corner. We note that Wise prepared the corrected field notes of Section 12, Block 1, H. & G. N. Ry. Co. in May, 1882, and the field notes for the Rodman sections in September 1882. The evidence supports the jury's finding that Section 5, John Rodman contained only 640 acres and that its boundary lines are 1900 varas long.

We hold that the Rodman Block is a system survey done at

the same time. There is no evidence in this record to show that Wise did not construct his Rodman Block as his field notes show he did. Wise constructed his surveys from the one and only original corner, and he constructed Sections 1, 3 and 5, Rodman, to contain 640 acres each and with the boundary lines of each 1900 varas long.

■ The presumption is that Wise constructed his surveys and ran his course and distance as called for by him in his field notes. State v. Sullivan, 127 Texas 525, 92 S.W. 2d 228, 232, (1,2); Worthington v. Boughman, 84 Texas 480, 19 S.W. 770; Tippett v. Woodley, 230 S.W. 2d 282, 289 (1,2), Texas Civ. App. Unless later surveyors can, by following the original surveyors' footsteps, show that the original surveyors' calls are a mistake and incorrect, the survey must be constructed as called for by the original surveyor. Wheeler v. Stanolind Oil & Gas Co., 151 Texas 418, 252 S.W. 2d 149; Carmichall v. Stanolind Oil & Gas Co., supra; Schnackenberg v. State, 229 S.W. 934, Texas Civ. App., 1921, no writ history; Duval County Ranch Co. v. Rogers, 150 S.W. 2d 880 (2), Texas Civ. App., 1941, ref.; Brooks v. Slaughter, 218 S.W. 632, Texas Civ. App., 1920, no writ history.

The jury found in response to special issues that each of Sections 1, 3 and 5, as originally located by the Surveyor L. S. Wise, did not contain more than 640 acres. The jury also found that Wise ran the lines of each of these three sections to be 1900 varas in length and on the course as called for in his field notes. The Court fo Civil Appeals held that such findings were supported by the evidence.

There being found on the ground only the stipulated original corner, and the jury findings that Sections 1, 3 and 5, John Rodman, contained no excess above the 640 acres patented, the original field notes must be respected. The judgment of the Court of Civil Appeals that the State take nothing is affirmed.

■ We shall next discuss the rights of R. G. Maben, Jr., Frank Stewart, Mrs. Maggie Wood and their assignees in and to any portion of the river bed. They have sufficient common interest that it will save time to combine them under one discussion, noting such individual differences as may be pertinent. Sections 1, 3 and 5, Rodman, and Section 12, Block 1, H. & G. N. Ry. Co. were a part of what is sometimes referred to as the Boley Brown Ranch. The Salt Fork of the Brazos River runs through all four of these sections, and the river is within the boundaries of each of these sections as surveyed and patented. On April 1, 1924

W. W. Barron purchased this ranch of some 21,000 acres from its then owner, D. R. Kendall. Kendall conveyed the ranch to Barron by warranty deed reserving vendor's lien notes to secure a payment of a portion of the purchase price. The Salt Fork was stipulated to be a navigable stream and although the river bed was included in the area patented and conveyed by Kendall to Barron, no title to the river bed adverse to the State passed from Kendall to Barron. City of Austin v. Hall, 93 Texas 591, 57 S.W. 563; State v. Bradford, 121 Texas 515, 50 S.W. 2d 1065; Heard v. Town of Refugio, 129 Texas 349, 103 S.W. 2d 728; Heard v. State, 146 Texas 139, 204 S.W. 2d 344; Mitchell v. Town of Refugio, 265 S.W. 2d 261, Texas Civ. App., 1954, wr. ref.; Article 5302, Vernon's Annotated Civil Statutes.

By deed dated August 1, 1924, but not acknowledged until December 1924, Barron conveyed by warranty deed 1,542.9 acres of land to J. A. Price. Included in this conveyance were all of Sections 3 and 5, John Rodman lying west and north of the Salt Fork. Intervenors Stewart, holder of the Price title, and those claiming under him, contend that this conveyance from Barron to Price, plus a correction deed executed in October 1930 by Barron et al to J. E. Johnson, grantee under Price of the lands in Sections 3 and 5, included all the land down to the edge of the bed of the Salt Fork of the Brazos River. Defendants, Strayhorn et al contend that land was conveyed only to the limits of the field notes set out in such deed. The original deed described the lands conveyed by section numbers and by a description reading in part as follows:

"Beginning at the N.W. corner of Sec. 4 (John Rodman) * * *; thence South 1568.16 vrs. to a point on the left bank of White River from which a cottonwood tree 10" bears S. 78 Deg. E. 19.1, * * * *Thence following the meanerings of White River and the Salt Fork of the Brazos to a point in the north line of Sec. No. 3, * * *.*"

Then follow a number of short calls giving variations and length of each until the point on the north line of Section 3 is again reached. It is clear from a reading of these calls that they are made for the purpose of following the meanderings and sinuosities of White River until it merges with the Salt Fork some mile southwest of the southwest corner of Section 3, John Rodman and then following the Salt Fork to the point in the north boundary line of Section 3. The description of that part of Section 5 lying west of the river was set out in a correction deed later given by Barron and Price to one Johnson, and was

designated as "Third Tract." The beginning point is the same point as that referred to in the calls on Section 3 as the point where the left bank of the Salt Fork first intersects the east boundary of Section 3. The course and distance calls follow the meanders of the river to the northern intersection of the left bank of Salt Fork with common boundary of Sections 3 and 5, and thence south with the west line of Section 5-805.5 vrs. to the place of beginning.

On November 29, 1924, W. W. Barron et ux conveyed by warranty deed to A. Wood, predecessor in title to Maggie Wood et al., all of the land abutting the south bank of the Salt Fork of the river in Sections 3 and 5, John Rodman. The description in this conveyance describes the land conveyed as follows: "Fourth Tract:—Being a part of Section No. 3 and a part of Section 5 of the John Rodman Survey following the south bank of the Salt Fork of the Brazos River, * * *." Here follow calls for course and distance showing the surveyor is describing the course of the Salt Fork.

On February 6, 1925, W. W. Barron by warranty deed conveyed to R. G. Maben, Jr. "the South one-half (S½) of Section No. One (1) of the John Rodman Survey in Kent County, Texas, described by metes and bounds as follows: Beginning at the S.W. corner of Section No. 1 * * *; Thence N. 88-40 E. 1544 vrs. to the left Bank of the Salt Fork of the Brazos River; Thence following the left bank of said river to a point * * *, *the following are the meanderings of the left bank of said river* * * *," and here follow course and distance calls showing the surveyor is following the river. (Emphasis added).

Mr. Yeatts and Mr. Estes, surveyors who had run the calls in all three of the above deeds, testified that these meander calls sometimes go into the bed of the river; sometimes stay upon the bank; wave back and forth, but generally follow the sinuosities of the stream. The various owners built fences on their respective river fronts.

It was stated by this Court in the case of Stover v. Gilbert, 1923, 112 Texas 429, 247 S.W. 841, with regard to whether or not course and distance calls meandering the Brazos River were the limits of the tract conveyed, or whether the tract was bounded by the Brazos River, as follows:

"* * * It is a rule of general acceptation that meander lines of surveys of land adjacent to or bounding upon a stream are

not to be considered as boundaries, but they are to follow the general course of the stream, which in itself constitutes the real boundary * * *."

"The rule is concisely stated in Corpus Juris, book 9, p. 189, as follows:

'The general rule adopted by both state and federal courts is that meander lines are not run as boundaries of the tract surveyed, but for the purpose of defining the sinuosities of the banks of the stream or other body of water, and as a means of ascertaining the quantity of land embraced in the survey. The stream or other body of water, and not the meander line as actually run on the ground, is the boundary, the purpose of meander lines being merely for the benefit of the government in ascertaining the quantity of land in the survey for which it requires payment.'

"In Ruling Case Law, book 4, p. 97, the same rule is expressed in this language:

'In surveying land adjacent to a stream, whether navigable or not, lines are often run from one point to another along or near the bank or margin of the stream, in such a manner as to leave a quantity of land lying between these lines and the thread or bank of the stream. These are called meander lines, and they are not the boundaries of the tract, but they merely define the sinuosities of the stream which constitute the boundary, and as a general rule the mentioning in a deed or grant of a meander line on the bank of a river will convey title as far as the shore unless a contrary intention is clearly apparent.' "

See also Rudder v. Ponder, 1956, 156 Texas 185, 293 S.W. 2d 736 (5) ; Johnson v. Phillips Petroleum Co., 257 S.W. 2d 813, Texas Civ. App., 1953, no writ history; Teal v. Powell Lumber Co., 262 S.W. 2d 223 (8), 1953, no writ history; Burkett v. Chestnutt, 212 S.W. 271, Texas Civ. App., 1919, no writ history; McCombs v. McKaughan, 195 S.W. 2d 194, Texas Civ. App.,, 1946, wr. ref.; State v. Atlantic Oil Producing Co., 110 S.W. 2d 953, Texas Civ. App., 1937, wr. ref.; State v. Arnim, 173 S.W. 2d 503, 508 (3-7), 1943, ref. w.o.m.; 7 Texas Jur. 128, Sec. 9; 11 C.J.S. 572-573.

Another good reason for extending the title of grantees to the bed of the stream is that they might be able to enjoy the riparian rights which they are entitled to by virtue of owning land adjoining the river. These rights are discussed in Motl v.

Boyd, 1926, 116 Texas 82, 286 S.W. 458, 467; American Law of Property, Vol. III, Sec. 12.32, pp. 265, et seq.; Kinney on Irrigation and Water Rights, 2d Ed., Vol. 1, p. 549, Secs. 334, et seq.; 65 C.J.S. 255, Sec. 122.

■ The fact that the patents to the four sections cross a navigable stream did not make such patents void. The title to the river bed was in the original patentee and his assigns and was valid until set aside by proper judicial proceedings brought by the Attorney General on behalf of the State. Third parties could not question the title to the river bed held by such patentees or awardees and their assigns. Fitzgerald v. Robison, 1920, 110 Texas 468, 220 S.W. 768; State v. Bradford, supra; Dunn v. Wing, 1910, 103 Texas 393, 128 S.W. 108; O'Keefe v. Robison, 1927, 116 Texas 398, 292 S.W. 854 (3); King v. Schaff, 204 S.W. 1039, 1041, 2nd col., Texas Civ. App., no writ history; Bunnell v. Sugg, 135 S.W. 701, 703, 2nd. col., Texas Civ. App., 1911, no writ history, but cited with approval in State v. Bradford, p. 1069. Most of the cases used an expression "that as between third parties this land [river bed] is titled land" or some similar expression. As to the rights of third parties the land being titled land it follows that all the rights Barron had in the west and south one-half of the bed of the Salt Fork was an appurtenance attaching to the land abutting the river on the west and south sides thereof, and therefore, in the absence of an express reservation, passed to Price, Wood and Maben and their assigns. In the case of Stradley v. Magnolia Petroleum Co., 155 S.W. 2d 649, Texas Civ. App., 1941, wr. ref., there are quotations from various authorities of which the following from 26 C.J.S., Deeds, p. 386, Sec. 106, is appropos:

" 'It is a general rule that upon the conveyance of property the law implies a grant of all the incidents rightfully belonging to it at the time of conveyance and which are essential to the full and perfect enjoyment of the property.' "

See also Harris v. Currie, 1944, 142 Texas 98, 176 S.W. 2d 302 (1).

We hold that Wood, Price and his assigns, and R. G. Maben, Jr. took title to their land down to the bed of the Salt Fork adjoining their lands, together with all rights Barron had in the west one-half of the river bed by virtue of his ownership of the land west and south of the river. Texas Bithulithic Co. v. Warwick, 293 S.W. 160, Com. App., 1927; Cox v. Campbell, 1940, 135

150

Texas 428, 143 S.W. 2d 361; 65 C.J.S. 251, Sec. 120b(1); Id., 255, Sec. 122a.

■ Next we shall discuss the effects of the Small Bill on the title to the bed of the Salt Fork of the Brazos River as it affects the next above mentioned owners of lands west and south of the Salt Forks in Sections 3 and 5, and west of the River in the south one-half of Section 1, all in the John Rodman. Defendants, Strayhorn et al, claim that by virtue of certain jury findings to the effect that the fences, as actually erected, were recognized or acquiesced in as the correct boundaries, therefore, title could not pass to the river bed or carry any rights therein. By the answers to Issues Nos. 14, 15 and 16, the jury found that at the time the lands were conveyed by Barron to A. Wood, J. A. Price and R. G. Maben, Jr. no doubt or uncertainty existed as to the boundary line between Barron and his grantees. By the answers to Issues Nos. 17, 18 and 19, the jury found that at the time the fences were built Barron and his respective grantees "did not agree by words" that the line, as fenced, would be the boundary line of their respective lands. By answer to Issues Nos. 14a, 15a and 16a the jury found that after the fences were built, such fences had been recognized, or acquiesced in, as the boundary line separating their respective lands. By answers to Issues Nos. 14B, 15B and 16B, the jury found that at the time the fences were built Barron and his grantees had, by their acts and conduct, agreed that the line, as fenced, would be the boundary line between their respective tracts.

The facts regarding the boundaries were undisputed. The jury finding that no doubt or uncertainty existed and that there was no agreement "by words" as to the fences being the boundary shows there was no dispute or uncertainty as to the true boundary. At best, the jury findings show only an acquiescence in the boundary as shown by the fences built. The correct boundary was a question of law. In the case of State v. Atlantic Oil Producing Co., 110 S.W. 2d 953, 958, Texas Civ. App., 1937, wr. ref. the rule is stated to be "* * * And when, as here, the purpose of the meander calls is clear, there remains no fact question to be determined by a jury, but the question of whether the river, rather than the course and distance lines, constitute the boundary, is one of law for the court. Schackenberg v. State (Texas Civ. App.) 229 S.W. 934; Bolton v. Lann, 16 Texas 96; Galveston County v. Tankersley, 39 Texas 651, 652; 9 C.J.S. Sec. 348, p. 289; 7 Texas Jur. p. 134."

The case of Great Plains Oil & Gas Co. v. Foundation Oil Co.,

1941, 137 Texas 324, 153 S.W. 2d 452, discusses fixing boundary lines by acquiescence. The rule is stated as follows:

"* * * But acquiescence in a line other than the true line will not support a finding of an agreement establishing the line as the boundary when there is no other evidence of agreement than acquiescence and when it is affirmatively shown that the use of the line resulted not from agreement but from a mistaken belief of the parties that it was the true line. Stier v. Latreyte, Texas Civ. App., 50 S.W. 589; Hunter v. Malone, 49 Texas Civ. App. 116, 108 S.W. 709; Gulf Oil Corporation v. Marathon Oil Company, Texas Sup., 152 S.W. 2d 711. Similarly, when the true location of the line is conclusively proven, mere acquiescense in another line in the mistaken belief that it is the true line will not support a finding that such other line is the true line. Buie v. Miller, Texas Civ. App., 216 S.W. 630 (application for writ of error refused); Thompson v. Allen, Texas Civ. App., 111 S.W. 2d 791."

■ The result of the deeds from Barron and wife to Wood, Price and Maben was that Barron had divested himself of all title to the land included within the boundaries of the patents to the south half of Section 1, and all of Sections 3 and 5 lying west and south of the Salt Fork, including that half of the river bed opposite their respective lands. Wood, Price and Maben and their assignees are assignees of the patent to the west part of the river bed, and, therefore, entitled to have their title to that portion of the river bed in proportion that they are assignees of such patents. Moore v. Ashbrook, 197 S.W. 2d 516, 518 (5,6), Texas Civ. App., 1946, wr. ref.

■ We hold that when a private person (including corporations, etc.) conveys title to lands owned by him abutting a stream— whether navigable or not—such conveyance passes to the grantee (unless the conveyance clearly shows a contrary intention), title to the one-half of such stream bed abutting his land, subject, of course, to whatever rights the State of Texas may have in the stream bed. At the time of the passage of the Small Bill, Barron had title only to that part of the uplands east of the Salt Fork in Section 5, John Rodman and Section 12, Block 1, H. & G. N. Ry. Co., plus 12.21 acres east of the river in the corners of Sections 1 and 3, John Rodman. It will be noted that the Small Bill confirms and validates, relinquishes and quit-claims and grants title to the patentees and their assignees of *all land included* in surveys theretofore made and in patents theretofore issued which lie across, or partly across, navigable streams, and

which patents have been in existence for ten years and have not been cancelled or forfeited.

A study of Motl v. Boyd, supra; State v. Grubstake Inv. Ass'n., 1927, 117 Texas 53, 207 S.W. 202; State v. Black Bros., 1927, 116 Texas 615, 297 S.W. 213; Manry v. Robison, 1932, 122 Texas 213, 56 S.W. 2d 438, demonstrates that riparian owners (those holding title to lands abutting a stream) share in all the rights they have in the river bed in proportion that their lands abut the stream. Any other construction of the Small Bill would violate the philosophy of our laws affecting riparian owners. Moore v. Ashbrook, supra. It is said that Article 5302, Vernon's Annotated Texas Civil Statutes, originally passed by the Congress of the Republic of Texas, was for the purpose of preventing monopoly control of waters and reserving to the public generally certain rights of the use of waters in navigable streams; subject, however, to the rights of those owning riparian lands abutting the stream. City of Austin v. Hall; supra; Heard v. Town of Refugio, supra; Angell, Law of Watercourses, p. 16, Sec. 3. The Small Bill was to put at rest titles and rights in stream beds—not to cause additional litigation over them. The Legislature, at the time of the passage of the Small Bill, was aware of the holding of the Supreme Court in the above cited cases (and there are many more that could be cited on the same legal proposition) and must have intended to leave this rule of law in effect rather than overturn it.

The case of Manry v. Robison, supra, and the authorities therein, support the proposition that upon the passage of the Small Bill the title in the bed of the Salt Fork and other navigable streams vested in the owners of abutting (riparian) lands in proportion as their lands lay alongside such stream. This includes all title held by Barron, subject to the rights of the State of Texas. Manry v. Robison was a case which involved the title of a portion of a horseshoe bend in the river bed of the Brazos that was no longer the river bed, due to avulsive change, whereby the Brazos cut across the neck of land at the ends of the corner of the horseshoe bend to form a new straight channel for the river. Manry sought a mandamus against Mr. Robison to require the issuance of a mineral permit to prospect for oil and gas in the abandoned bed of the river. One Cooper came into the lawsuit and sought a mandamus to require the Commissioner of the General Land Office to *sell* him the abandoned bed of the river. Manry's and also Cooper's theory was that such abandoned bed was still the property of the sovereign of the soil— the State of Texas. In an exhaustive opinion, discussing fully

the law applicable, this Court, writing through Chief Justice Cureton, held that the river bed upon its abandonment, became the property of the owners of riparian or adjacent lands. There is a similarity between the State losing its title through the river's abandonment of the bed and the State's relinquishing its title through the Small Blil.

■ Barron who owned the land abutting on the east side of the river bed became the owner of that one-half of the river bed adjoining his land, he being an assignee of the original patent to this one-half of the stream bed. We hold that upon passage of the Small Bill, Wood became the owner of the title to the south one-half of the river opposite the banks of his abutting lands. Mr. Johnson, (whose title is now held by Stewart), the assignee of Price's interest in Sections 3 and 5, John Rodman, became the owner of the north and west one-half of the river bed opposite the banks of his abutting lands. R. G. Maben, Jr. became the owner of the west one-half of the river bed opposite the banks of his adjoining lands. In his deeds of conveyance Barron had not specifically reserved any part of the bed of the Salt Fork of the Brazos. Barron became the owner of the east one-half of the river bed opposite the banks of his adjoining lands. This result, we feel, is in harmony with the laws of our State. Of course, all titles to the river beds vesting in the individual grantees are subject to "all those rights to which the beds of statutory navigable streams or water course had been theretofore reserved under the public policy and laws of this state. * * *." State v. Bradford, 1932, 121 Texas 515, 50 S.W. 2d 1065, 1076, (15), 1077(19).

■ Defendants Strayhorn et al contend that the above holding will conflict with the holding in the case of Heard v. Town of Refugio, 1937, 129 Texas 349, 103 S.W. 2d 728; Heard v. State, 1947, 146 Texas 139, 204 S.W. 2d 344, and Mitchell v. Town of Refugio, 265 S.W. 2d 261, Texas Civ. App., 1954, wr. ref. We do not so construe our holding. The Town of Refugio was a municipality and Barron was an individual at the time each made respective deeds. There is a well recognized difference between conveyances made by the sovereign, municipalities, etc. and those made by individuals. Where the sovereign or municipality makes a conveyance of land bordering on a stream without specifically including lands under streams, the settled rule of law is that such grantor intended to convey only to the water line in order to preserve for the public all rights to enjoy the stream bed and the water therein. Heard v. Town of Refugio, 1937, 129 Texas 349, 103 S.W. 2d 728, 732 (4), and the authorities therein cited;

City of Galveston v. Menard, 1859, 23 Texas 349, 390; Landry v. Robison, 1920, 110 Texas 295, 219 S.W. 819; 8 Am. Jur. 759, Sec. 21; Id., p. 769, Sec. 32; 65 C.J.S. 248. When private parties make a conveyance of land bordering on a stream without an express reservation of the stream bed the settled rule of law is that the grantor intended to convey whatever title he has to land under water. Moore v. Ashbrook, supra; 7 Texas Jur. 132, Sec. 13; 56 Am. Jur. 888, Sec. 474; 65 C.J.S. 251, 253; American Law of Property, Vol. III, p. 244, Sec. 12.27 and 12.113. We will not extend the first Heard case so as to include conveyances by private individuals of land abutting on a stream. Therefore, the Town of Refugio did not convey any title to any rights in the river bed; whereas, Barron did convey all interest he might have in the river bed to his grantees. Further Barron having no title to the river bed adverse to the State, could convey no title adverse to the State, but as between Barron and his grantees, his conveyance would divest him of any claim to the west one-half of the river adjoining the Wood, Price and Maben lands. Barron did not reserve any rights to title in the river bed in his conveyances. Barron was not an owner of any uplands covered by patents to the lands west and north of the river, nor as to Sections 3 and 5 south of the river at the time of the passage of the Small Bill. He had parted with all rights and claims to such uplands some five years prior to the passage of the Small Bill.

In the Heard case found in 204 S.W. 2d 344, decided by this Court, the Heards claimed title to the river bed solely by limitations. This Court affirmed the Court of Civil Appeals' judgment denying the Heard claim on the ground that the possession of the Heards was not such adverse possession as required by Article 5515, Vernon's Annotated Texas Civil Statutes.

The case of Mitchell v. Town of Refugio, supra, was a suit by the Town to recover title to a part of the Mission River and Mitchell and others sought to reopen the question as to the ownership by the Town of the river bed. The trial court gave a judgment for the Town. Upon appeal it was held that the holding of this Court in the Heard cases had settled this question and the doctrine of stare decisis applied. We refused writ of error.

In December 1929 after the effective date of the Small Bill, Barron and wife gave a deed of trust to B. B. Stone, Trustee for Chicago Livestock Loan Company, to secure an indebtedness to the Loan Company. As affects the land in controversy here, the description was set out as "all of the land * * * known as Survey No. 5, lying East of the Salt Fork of the Brazos River * * *"

and "being that portion of land lying East of the Salt Fork of the Brazos River, known as Section No. 12, Block 1, H. & G. N. Ry. Co. * * *." There was a further description that "the above lands conveyed to W. W. Barron by D. R. Kendall * * *" referring to the deed whereby Barron obtained title to the Boley Brown Ranch. The indebtedness being delinquent, suit was filed in a District Court of Tarrant County, Texas, to collect the indebtedness and foreclose the deed of trust lien. In this suit a receiver was appointed, who, under proper orders of the District Court, sold the lands covered by the deed of trust at public auction at a time and place as provided in the deed of trust. At this sale the Loan Company purchased all of the lands included in the description of the deed of trust. This sale is not attacked. It is contended by the defendants that the foreclosure proceedings did not include the 12.21 acres strip of land between Section 5, John Rodman, and Section 12, Block 1, H. & G. N. Ry. Co. and the east bank of the Salt Fork of the Brazos River, nor did it include any part of the river bed. The description of the land conveyed by the deed of trust as that "lying East of the Salt Fork of the Brazos River" means the land lying adjacent to the water, or bed of the river, on the east side thereof. Teal v. Powell Lumber Co., supra; Graham v. Knight, 240 S.W. 981, 983, Texas Civ. App., 1922, no writ history.

■ At the time the deed of trust was made Barron had the title to the east half of the Salt Fork adjoining his land. The deed of trust conveyed to the Trustee all of the right Barron had in the river. The case of Moore v. Ashbrook, supra, holds that if the bed of a stream, navigable or nonnavigable, is owned by an individual, a deed to abutting lands carries title to the middle of the stream, unless a contrary intent is clearly shown by the language of the instrument. Defendants contend that in the Moore case it was stipulated that the stream was a nonnavigable stream, and that the rule of law above applies only to non-navigable streams. We do not so read the case. It was stipulated that Moore was the common source of title, and both parties claim under him. The suit was for recovery of the west one-half of the bed of Las Moras Creek. Appellant, Moore, contended the evidence raised an issue as to whether or not the stream was a navigable stream, and that the trial court erred in failing to submit an issue to the jury on this question. The trial court had instructed a verdict for the party who held a deed from Moore conveying land on the west bank of Las Moras Creek. The Court of Civil Appeals based its affirmance of the trial court's judgment upon the proposition that Moore being the

owner of the stream bed involved, his conveyance of the land abutting the west bank of the Creek without any mention of stream bed, conveyed title to the middle of the stream, regardless of whether or not Las Moras Creek was a navigable stream under Article 5302, Vernon's Annotated Texas Civil Statutes. This Court unqualifiedly "refused" the application for writ of error in the case of Moore v. Ashbrook, supra. That "refusal" was at a time when both Judge Sharp, who wrote State v. Bradford, (121 Texas 515, 50 S.W. 2d 1065) and the second Heard case (146 Texas 139, 204 S.W. 2d 344), and Judge Smedley who wrote the first Heard case (129 Texas 349, 103 S.W. 2d 728) were members of the Court. This Court's action in unqualifiedly refusing the application approved the principle of law as declared by the Court of Civil Appeals. Agnew v. Coleman County Electric Cooperative, Inc., 1954, 153 Texas 587, 272 S.W. 2d 877; Heinatz v. Allen, 1929, 147 Texas 512, 217 S.W. 2d 994. The description of the lands in Section 5, Rodman and Section 12, Block 1, H. & G. N. Ry. Co. contained in the receiver's deed to the Loan Company is in the *same language* as that in the deed of trust and in the judgment of foreclosure. We hold that by virtue of the description contained in the deed of trust, the foreclosure and sale under proper orders of the court by the receiver and by his deed, and under the provisions of the Small Bill, the Loan Company acquired the title to all land lying east of and adjoining the Salt Fork on the east up to the middle of the bed of the Salt Fork.

In 1935, by appropriate resolutions and warranty deed, the Loan Company conveyed to Percy Jones, Independent Executor of the Morgan Jones Estate and predecessor in title of the plaintiffs herein, a total of 12,884.62 acres of land, described in individual tracts, by reference to a plat and field notes prepared by W. A. Riney, a surveyor who ran the outer boundary lines after the execution of the contract of sale, but prior to the making of the deed. The metes and bounds description of the outer boundary of the lands conveyed, and as they affect this litigation, are as follows:

"Thence in a Westerly direction with the S.B. line of Section No. 5, to the East Bank of the Salt Fork of the Brazos River; Thence in a Northwesternly direction with the East Bank of the River to the W. B. line of Section No. 5, John Rodman Survey; Thence North with the W. B. lines of Section No. 5, John Rodman and Section No. 12, Block No. 1, H. & G. N. RR. Co. to the South or East bank of the Salt Fork of the Brazos River; Thence in a Northeasterly direction with the meander-

ing of the river bank to the N. B. line of Section No. 12, Block 1, H. & G. N. RR. Co.; Thence East with the N. B. line of Section No. 12, to the South bank of the Salt Fork of the Brazos River; Thence in an Easternly direction with the meanderings of the river bank to the E. B. line of Section No. 12, Block No. 1, H. & G.. N. RR. Co."

We hold that this deed passed title to the Morgan Jones Estate to the east one-half of the Salt Fork of the Brazos River adjoining and opposite the east river bank in Section 5. Rodman and Section 12, Block 1, H. & G. N. Ry. Co.

■ Defendants contend that since the field notes of the resolution and warranty deed from the Loan Company to Percy Jones do not include the 12.21 acres strip in the northeast corner of Section 3, and the southeast corner of Section 1, Rodman, but, on the contrary, leave the river at its north intersection of the common boundary lines of Sections 3 and 5, Rodman, and proceed north from this point along the west boundary line of 5 and 12 to the south intersection of the right bank of the river with the west boundary line of 12, (the west boundary line of 12 being also the east boundary line of Section 1, Rodman), this excludes the strip from the conveyance, and title did not pass out of the Loan Company to Jones. There is evidence that it was intended to include the strip in the lands sold to Jones although this 12.21 acres is not included in the total acreage of 12,884.62 acres of land for which Jones paid $6 per acre, or a total consideration of $77,306.16 cash. Also we notice that the contract for the sale of the land to Jones provides for a sale and conveyance of between 13,000 and 14,000 acres of land in Kent County, Texas, being that portion owned by the Loan Company of the ranch formerly known as the Mrs. Boley Brown & Son Ranch, the unsold portion of which has been more recently known as the W. W. Barron Ranch. This 12.21 acres strip was a part of the Mrs. Boley Brown Ranch according to all the testimony concerning same. The contract further provides that the ranch be surveyed prior to the making of the deed and binds Jones to pay $6.00 per acre for the acreage determined by the survey. The evidence shows that the land sold to Jones was known as the "24 Shinnery Pasture," and that the 12.21 acres was a part of such "24 Shinnery Pasture." It further shows that there was no fence separating this strip from the rest of the ranch; that the strip was used as part of the ranch; that by itself in 1935 the strip had very little value, if any; that Barron made no claim of any kind to the river bed or to this strip of land after the deed of trust foreclosure and sale, nor

did he pay any taxes thereon up to 1950 when he gave a quit-claim deed to defendants. Considering all the facts and circumstances, we hold that the title to the 12.21 acres strip passed to Jones under the strip and gore doctrine just as it had passed to the Loan Company under the same doctrine in the foreclosure sale. The strip and gore doctrine can have application only when the specific strip is not included in the field notes of the conveyance. If it were so included, it would pass under the conveyance.

This Court, in the case of Cantley v. Gulf Ref. Co., 1940, 135 Texas 339, 143 S.W. 2d 912, said:

"It is well known that separate ownership of long narrow strips of land, distinct from the land adjoining on each side, is a fruitful source of litigation and disputes. To avoid this source of contention, it is presumed that a grantor has no intention of reserving a fee in a narrow strip of land adjoining the land conveyed when it ceases to be of use to him, unless such fee is clearly reserved. The reason for the rule is obvious. Where it appears that a grantor has conveyed all land owned by him adjoining a narrow strip of land that has ceased to be of any benefit or importance to him, the presumption is that the grantor intended to include such strip in such conveyance; unless it clearly appears in the deed, by plain and specific language, that the grantor intended to serserve the strip. See Cox v. Campbell, 135 Texas 428, 143 S.W. 2d 361; Rio Bravo Oil Co. v. Weed, 121 Texas 427, 50 S.W. 2d 1080, 85 A.L.R. 391; Texas Bithulithic Co. v. Warwick, Texas Com. App., 293 S.W. 160. For an annotation of the decisions bearing on this question, see also 123 A.L.R. 543, 47 A.L.R. 1277, and 2 A.L.R. 7."

Our latest expression that it is against public policy to leave title of a long narrow strip or gore of land in a grantor conveying a larger tract adjoining or surrounding this strip is found in the case of Haines v. McLean, 1955, 154 Texas 272, 276 S.W. 2d 777, 782 (4). In that case it was held that certain deeds describing an entire tract of land, which was intersected by a series of different but adjoining narrow easements of way, conveyed the fee title of the entire tract (subject to the easements) notwithstanding language referring to the easement area as if expected and notwithstanding that the acreage conveyed was stated to be the total acreage of the tract less that corresponding to the easements. It was also held that a deed to the easterly portion of the same tract, describing the westward-

ly boundary of said portion as being the easterly line of the nearest of the several easements, carried the fee title to the center line of the combined easement (subject, of course, to the rights of the easement owners). These holdings were partly basd upon the rule of law concerning strips and gores. See also Cox v. Campbell, 1940, 135 Texas 428, 143 S.W. 2d 361; Earhart v. Rosewinkle (108 Ind. App. 281, 1940), 25 N.E. 2d 269, 272.

■ We next dispose of the title to the accreted land along the south, or right bank, of the Salt Fork which constitutes the north boundary of the Wood land. Having held that under the Barron deed Wood took all of Barron's title to the center of the stream, and that under the Small Bill his title was ratified and confirmed to the south one-half of the river opposite the bank of the river which he owned, it follows that the title to all accreted land on this south bank vested in Wood and his assignees, as their interests may appear. Sharp v. Womack, 1936, 127 Texas 357, 93 S.W. 2d 712; Hancock v. Moore, 137 S.W. 2d 45, Texas Civ. App., 1939, aff. 135 Texas 619, 146 S.W. 2d 369; Rosetti v. Camille, 199 S.W. 526, Texas Civ. App., 1917, wr. ref.; Denny v. Cotton, 22 S.W. 122, Texas Civ. App., 1893, wr. ref.; 11 C.J.S. 579, Sec. 34; 65 C.J.S. 255, Sec. 122b.

The judgment of the trial court and the Court of Civil Appeals is affirmed.

Opinion delivered March 6, 1957.

Rehearing overruled April 24, 1957.