Glen P. HURR et al., Appellants,

v.

Ruth Ann HILDEBRAND et al., Appellees.

No. 14495.

Court of Civil Appeals of Texas.

Houston.

Feb. 18, 1965.

Rehearing Denied March 11, 1965.

G. F. Steger, Columbus, R. F. Evans, Groveton, for appellants.

Hodges, Moore & Gates, Otto Moore, Jr., Hollis Massey, Columbus, for appellees.

WERLEIN, Justice.

Appellees brought this suit in trespass-to-try title to recover title and possession of a

tract of 32.52 acres of land in Colorado County. The suit involves a boundary dispute between appellants and appellees, the appellants contending that the boundary is a fence line on the south side of their land, which separated their tract from appellees' adjoining tract for more than 60 years, and the appellees contending that the true line was not the fence line but a line parallel therewith and some 95 varas north thereof. Appellants filed pleas of not guilty and have set up various statutes of limitation, long recognition of the fence line as being the true line, and acquiescence by appellees therein. Judgment was entered in favor of appellees by the court upon the jury verdict which found against appellants on the issues covering limitation and adverse possession, and also on the issue covering acquiescence on the part of appellees in the fence as being the true boundary line between the tracts. The jury did not answer the issue as to whether the land in dispute was enclosed under the fence in dispute by mistake as to the true location of the south boundary line of appellants' land, known as the Hurr land, but did answer that D. P. Hurr or his wife, Mattie Hurr, or those claiming under them, had admitted, acknowledged or recognized by words, acts or deeds that title to the tract of land in dispute was in other persons.

The land in dispute as well as the land recognized as belonging to appellants and also the land belonging to appellees is located in the W. K. Paulding (or Pauling) Survey No. 9, Abstract No. 462 and the W. K. Paulding Survey No. 10, Abstract 466, in Colorado County, Texas. On January 18, 1897, J. L. Jellison acquired from Sarah R. Thompson and husband, F. M. Thompson, a tract or parcel of land described as parts of Nos. 9 and 10, W. K. Paulding Surveys situated on the Sandies Creek about twenty miles south of Columbus in Colorado County, Texas, described by metes and bounds as follows:

"Beginning in the center of East Sandies in North line of No. 9, 62 varas East of its N W corner; Thence E through prairie 1559 varas to post in prairie in a mount, Thence South through prairie 2229 varas to corner in flat, Thence W about 1000 varas timber, 3070 varas to corner in center of the Creek, Thence up the center of the creek to the place of beginning containing 868.8 acres of land."

On May 22, 1897, Jellison sold a called 320 acre tract off the north side of said 868.8 acres to Jesse T. Rutherford, described by metes and bounds as follows:

"Beging in the center of E Sandies in North line of No. 9, 62 varas East of its N W corner, Thence E to the N E corner of No. 9, Thence South suficient distance to take in 320 acres, Thence W to the center of Sandies Creek, Thence up the Sandies Creek to the place of beginning."

This same description was used in the deed of said 320 acres from Rutherford to Mayfield dated July 5, 1900, and in the deed from Mayfield to D. P. Hurr, dated February 27, 1901. Included in the deed from Mayfield to Hurr and in the deed from Rutherford to Mayfield was also a 20 acre tract adjoining the 320 acres on the north, such 20 acre tract being out of land patented to the heirs of one Robert Mills.

On November 15, 1898 Jellison sold the residue of the 868.8 acre tract to one W. J. Boschert, describing the property by metes and bounds as follows:

"Beginning in the S E corner of No. 9, Thence West about 3070 varas to center of Sandies Creek; Thence up the center of Sandies Creek to the S W corner of a 320 acre tract, previously sold to Jesse T. and Susan A. Rutherford, off the North side of the tract bought from Sarah R. Thompson and F. M. Thompson by J. L. Jellison; Thence East to the S E corner of said tract, Thence South to place of beginning, containing in all 540 acres more or less."

In 1962 appellees, who deraign title under Boschert, had their 540 acres surveyed with the result that the same appeared to be lacking in acreage quantity. Thereupon appellees instituted this suit, claiming that the more than 60 year old Hurr south fence line was not the south boundary line of appellants' land but that such fence line was actually located on appellees' 540 acres, and was some 95 varas south of the true boundary line between the 320 and 540 acre tracts. For a better understanding of the contention between the parties, we are inserting a rough sketch of a plat, Appellees' Exhibit No. 3, which was introduced in evidence at the trial, upon which we have superimposed certain broken lines or dashes, and data illustrative of the contention of appellants with respect to the location of the boundary line between the so-called 320

and 540 acre tracts of land, as shown on the map offered in evidence by appellants.

In 1917 D. P. Hurr, under whom appellants claim, engaged Frank Davidson, Sr., to survey the 320 acre tract, which was not, up to that time, completely described by metes and bounds. Davidson in making his survey relied upon the patents issued to W. K. Paulding covering Paulding's Sections 9 and 10, and other data. He testified also that D. P. Hurr pointed out the northwest and northeast corners of Section No. 9. The patent to Section 9 to W. K. Paulding is dated April 28, 1859. The patent to No. 10 issued to W. K. Paulding is dated April 27, 1858. The patent to Section No. 9 was not filed for record in the Deed Records of Colorado County until November 11, 1910. Appellants introduced in evidence the field notes made by the original surveyor, J. J. Stolts, District Surveyor, on March 21, 1857, of both Sections 9 and 10 Paulding, upon which patents to such Sections were presumably based. We observe no difference between these field notes covering Sections 9 and 10 and the field notes in the patents covering such sections, although the point in the N 1621 varas distance call of Section 9, where the surveyor came to the E Branch of the E Sandies is given as 1400 varas in the surveyor's field notes and in the patent as 1600 varas from the N E corner of Sec. 9.

Shortly after Rutherford acquired the 320 acre tract in the Paulding Surveys in 1897 and the 20 acre tract in the Mills Survey, he completely enclosed the entire property with 3-wire barbed wire fences which would turn cattle. It is undisputed that such fences, including the fence along what was thought to be the common boundary line between the 320 and 540 acre tracts, remained in exactly the same positions and were continuously maintained from the time they were constructed until this suit was filed in 1962. Davidson began his survey in the center of Sandies Creek (not the E bank thereof), in the North line of Survey No. 9, W. K. Paulding, 62 varas East of

its N W corner; (this was the called place of beginning in the deed from Jellison to Rutherford in 1897); Thence East with the North line of Section No. 9 1552 varas to corner in same; Thence South with East line of No. 9 1124.3 varas to corner in same; Thence West 1864 varas to the center of East Sandies Creek; Thence up said creek with its meanders to the place of beginning, containing 320 acres of land. The South line of this survey made by Davidson in 1917 is not along the old fence line but some 95 varas North thereof.

It is appellees' contention that the South line thus established by Surveyor Davidson is the true boundary line between the 320 and 540 acre tracts of land. Appellants, on the other hand, assert that the fence line is the true and established South line of their 320 acre tract and the boundary line between the two tracts of land. Appellants called as their witness R. E. Schiller, Sr., a registered professional engineer, who at appellants' request made the map which we have undertaken to superimpose upon appellees' map, Plaintiffs' Exhibit No. 3. Schiller testified in substance that he made no survey on the ground; that he took the survey made by Davidson but that he placed Sandies Creek 1400 varas from the Northeast corner of Section No. 9, instead of 1552 varas as in Davidson's plat, thus moving the entire creek all the way from the North line of the survey to below the South line thereof, 152 varas East; that by so moving the creek and giving it the same meanders as shown in Davidson's map, the South line of the 320 acre tract would then be moved south to the fence line and the tract would contain 324.87 acres; that if he followed the patent which called for 1600 varas from the N E corner of the Section to Sandies, there would be yet more acreage in the tract; that in surveying land he would follow the patent rather than the field notes prior to the issuance of the patent although not adopted in the patent; and that Davidson was right in following the patent in making his survey in 1917, some 7 years after the patent dated April 28, 1859

had been filed in the Clerk's office in Colorado County.

No issue was submitted inquiring as to the true boundary line between the tracts. Appellants contend that there was a fact issue and that appellees should have requested such issue and that by not doing so they have waived the right to assert that the fence line was not the true boundary line. Appellants' contention with respect to the fence being the true boundary line is based upon the assumption that the field notes of 1857 should govern the location of Sandies Creek rather than the field notes in the patent issued two years later. They assert that in the original field notes of the District Surveyor, J. J. Stolts, the North call of Section No. 9 stated, "Thence W 1621 varas at 1400 varas came to the E bank of the East Sandies to the beginning." They hence contend that this shows that the Sandies was 1400 varas from the N E corner of the survey at the time the original field notes were written, although two years later the patent shows that the East Sandies at such time was 1600 varas from such corner.

There is a presumption that the original surveyor ran his course and distance as called for by him in his field notes. State v. Sullivan, 127 Tex. 525, 92 S.W.2d 228; Worthington v. Boughman, 84 Tex. 480, 19 S.W. 770; Tippett v. Woolley, Tex. Civ.App., 230 S.W.2d 283. Unless later surveyors can by following the original surveyor's steps show that the original surveyor's calls are incorrect, the survey should be constructed as called for. Strayhorn v. Jones, 1957, 157 Tex. 136, 300 S.W. 2d 623, and authorities there cited. In the instant case, the original bearing trees and marks shown in the field notes of Section 9 in 1857 and in the patent issued in 1859 could not be definitely located, with perhaps the exception of an old oak tree marking the N E corner of Section 9. Both the original field notes and the patents show that Sections 9 and 10 are adjoining with a common dividing line which crosses Sandies Creek at an undesignated point. The bearing trees and marks in the S E corner of Section 10 and the S W corner of Section 9 are identical. The courses and distances given in the original field notes and in the patents are the same and the corners are similarly marked. The surveys later made by Mr. Davidson, Sr. in 1917 and by Mr. Davidson, Jr., a registered public surveyor, in 1961–62, show practically the same courses and distances as in the patents and the original field notes of Sections 9 and 10.

The cardinal rule is that the footsteps of the original surveyor, if they can be ascertained, should be followed when attempting to locate the true lines of a survey. Where that cannot be done with reasonable certainty, all the surrounding facts and circumstances should be considered in order to arrive at the purpose and intent of the surveyor who made the original survey. State v. Sun Oil Co., Tex.Civ.App., 114 S.W.2d 936, writ ref.; State v. Humble Oil & Ref. Co., Tex.Civ.App., 128 S.W.2d 424, writ ref.; Gill v. Peterson, 126 Tex. 216, 86 S.W.2d 629; Gill v. Grimes, Tex.Civ.App., 238 S.W.2d 989.

From the evidence it seems clear that the figure "1400", which is merely a point in a distance call, was written in the original field notes of 1857 through error and that such figure should have been 1600, as it was in the patent issued only two years thereafter. In order to account for the difference between the figures 1400 and 1600, it would be necessary to assume that the Sandies had in two years moved to the west 200 varas. There is no evidence in the record that such phenomenon occurred. Indeed, the evidence shows that there was no appreciable change in the location of the Sandies Creek from the time Frank Davidson, Sr. made his survey in 1917, to the time his son made his survey in 1961–62. Mr. Davidson, Jr. testified at considerable length, as did his father, as to the surveys that were made. He testified that he saw no evidence on the ground that would indicate that the Sandies had ever been 1400

varas from the N E corner of Section No. 9. There is evidence of some changes in the Sandies farther South, but of no material changes in the creek in the vicinity of the Paulding Surveys.

In making his survey, Mr. Davidson, Sr. had the benefit not only of the field notes in the original survey of 1857, and the patent issued in 1859, but also of the description in the conveyance from the Thompsons to J. L. Jellison in 1897, wherein the beginning point of the 868.8 acres of land was established at 62 varas East of the N W corner of said Section 9. Mr. Davidson, Jr. found the same corner that his father had found, and testified that it was marked by a 19 inch oak tree which might have been there in 1857. In any event, in the deeds from the Thompsons to Jellison, and from Jellison to Rutherford, and from Rutherford to Mayfield, and from Mayfield to Hurr, the beginning point was the same, to wit: 62 varas E of the N W corner of Section No. 9.

In the deed to Jellison, who is the common source of title, the North line of Section 9 apparently passes the Sandies at 1552 varas instead of 1400 varas, since the beginning point of the Jellison tract is in the middle of Sandies Creek 62 varas East of the N W corner of Section 9. The deed to Jellison, and indeed the deed from Jellison to Rutherford, and Rutherford to Mayfield, and Mayfield to Hurr, are all ancient instruments, which may be looked to to establish the boundaries of the 868.8 acre tract, out of which was carved first the 320 acre tract and then the 540 acre tract. The original surveyor of Sections 9 and 10, so far as the record shows, never surveyed the 868.8 acre tract conveyed to Jellison.

Mr. Davidson did not locate the S E corner of Paulding No. 9, but he did survey the B. S. & F. No. 7 junior survey lying South of the Paulding. There was found to be no conflict between the Paulding Survey and the B. S. & F. No. 7, or between the Paulding Surveys and other adjoining surveys. The description of the 540 acre tract in the deed from Jellison to Boschert executed on November 15, 1898 calls for the S W corner of the 320 acre tract previously sold to Rutherford, thus establishing the South line of the 320 acre tract as the North line of the 540 acre tract. It should be noted also that neither Mr. Davidson nor his son was able to find the original bearing trees in the patent, as all such marks were gone. The measurements taken, however, did correspond substantially with the calls with the exception of the passing point of Sandies Creek in the N line distance call of Section 9.

In making his survey in 1961–62 Mr. Davidson, Jr. had not only the benefit of the patent notes but also the survey that had been previously made on the ground by his father and also all available records. A road and fence were located at the S E corner of No. 9. A gravel road ran along the recognized East line of Section 9. The same road was there in 1917. Mr. Davidson testified that the 320 acre tract which he surveyed was the same tract which was deeded to Hurr by Mayfield in 1901. There was only a minor difference of five acres in the 320 acre tract as surveyed by Mr. Davidson, Sr. and as surveyed by Mr. Davidson, Jr., and this was accounted for by a slight error in the notes of Mr. Davidson, Sr. There was evidence also to the effect that no part of the 32 acres in controversy was included in the Hurr deed but that it was included in the Boschert deed to the 540 acre tract.

█ It is our view that appellees have shown record title to the 32 acres in controversy and established the south boundary line of the 320 acre tract as being 95 varas North of and parallel to the fence line. Appellants' contention that the north call in the field notes prepared in 1857 establishes that the East Sandies was only 1400 varas from the N E corner of Section 9, and their assumption therefrom that the Sandies had moved its entire course 200 varas to the west, is not supported by any

evidence of probative force or any evidence at all more than a mere scintilla.

Mrs. Kinchloe, who in 1897, moved on the tract of land adjoining Section 9 on the east, known as the "Paschall Place," testified that the road on the west line of the Paschall Place was the east line of appellants' property; that she knew the Rutherfords and the Hurrs, and that when Rutherford moved on what is known as the Hurr tract he completely fenced the land. He lived on the tract and had a good fence all around the property. He farmed the land and had cattle and lived there about two or three years. Then the Hurrs moved in the house in 1901, when they bought the place. Hurr built a turkey fence along the south fence line of the property. He farmed the place and had turkeys, cattle, goats and hogs, and continuously lived on and used the place for more than 20 years. During that time he kept the fences in a good state of repair and did not move away from the property until about 1923. She further testified that the Hurrs claimed to own all the land within the fences.

Mr. Ira Briscoe was acquainted with the Hurr tract for some 55 years, and knew that during all that time there was no change made in the location of the fence on the south line of the 320 acre tract of land. He also knew that Hurr had built a turkey fence along such fence line, and lived on the property until the year 1923; that the Hurrs had hogs, cattle, turkeys, and also farmed the land. He testified that the place where the creek changed was down below the Hurr land and did not affect any of the Hurr land.

Mr. Flournoy testified that he became acquainted with the Hurrs in 1908. He also testified that Hurr and his family lived on the place and that Hurr had built a turkey-proof fence which was the talk of the country at that time. Mr. Lee Flournoy's testimony was similar to that of Mr. Ben Flournoy.

There is no dispute as to the fence lines. They have been in the same locations for over 60 years. It is our view that the uncontroverted testimony of the witnesses shows that D. P. Hurr and his wife, Mattie, lived on the premises for more than 20 years continuously and that during all of that time they used the entire tract of land within the fences, farming, raising, cattle, goats, hogs, and turkeys. We find nothing in the record to indicate that the Hurrs, during such period, did not intend to claim the entire tract of land within the fences, including the land in controversy. The evidence shows that they did claim such land, lived on it, used it, cultivated and enjoyed it, adversely to all parties, and that they matured a good ten year limitation title thereto. Even after a survey was made in 1917 by Mr. Davidson, Sr., and the S E corner of the tract was shown to be some distance north of the fence line, Mr. D. P. Hurr did not change the fence line but continued to use the property in the same manner that he had before. There is no evidence that he did not claim the land down to the south fence line.

After D. P. Hurr and Mattie Hurr moved from the place, their son, Raymond Hurr, leased or rented the property to Mrs. Kinchloe. Still later, after the death of D. P. Hurr, his widow, Mattie Hurr, in 1940 deeded her undivided one-half interest in the property to her son, R. M. Hurr, using both the original description in the original deed to Hurr and the description by metes and bounds as given in the survey made in 1917, both of which called for 320 acres. Also in a suit brought by the Hurr heirs against Shell Oil Company in 1956 the 320 acres were described as in the survey of 1917, and in a lease made in 1953 and in tax assessments from 1919 through 1961 the tract is described as 320 acres. Appellees contend that such acts and documents show that appellants were not claiming the land as fenced. Although such subsequent acts might possibly raise a fact issue with respect to later periods of limitation claimed by appellants as to whether the Hurr heirs were claiming adversely to the fence line, they do not constitute any evidence that D.

P. Hurr was not claiming the land to the fence line during the period that he matured a good limitation title which was long before such occurrences.

 There is no evidence whatever to support the jury's finding as applied to D. P. Hurr during the period he was maturing such limitation title that he ever admitted, acknowledged, or recognized, by words, acts or deeds, that title to the 32.52 acres of land was in other persons. Furthermore, as to D. P. Hurr and Mattie Hurr, during the time that they lived on the land there is no evidence whatever in the record to support the finding of the jury to Special Issue No. 3 that they did not have peaceful and adverse possession of the land in controversy in this suit, cultivating, using or enjoying the same, for a continuous period of ten years or longer, prior to November 8, 1943. No recognition or acknowledgment later on, even if such was made, could destroy the limitation title which they had previously matured. The law is well settled that title by limitation passes, on the claimant's death, to his heirs, and that a title acquired by limitation can no more be abandoned by moving away or orally conveyed or divested by other conduct, or orally relinquished than can a record title. 2 Tex. Jur.2d pp. 208–9, Adverse Possession, §§ 208, 210, and authorities cited.

Judgment reversed and rendered.

## On Motion for Rehearing

We do not agree with appellees that the opinion testimony of certain witnesses, probably inadmissible, that D. P. Hurr was a good man and would not claim by limitation land that did not belong to him, constitutes any evidence of probative force. The same witnesses also testified that he would claim what he thought belonged to him. The evidence is uncontroverted that he claimed everything within his fences and there is no evidence that he did not think he owned all the land within such fences. There is no evidence that D. P. Hurr rendered for taxes such land at any time prior to 1919, which was after he had matured a good limitation title. The fact that beginning with the year 1919 the tract of land was assessed in his name or in the name of his estate after his death as 320 acres constitutes no evidence of probative force that the claim of D. P. Hurr did not extend to the fence line during the period he matured the first ten year limitation title. The later assessment in his name and in the name of his estate of 320 acres would not constitute any evidence more than a mere scintilla at the most.

Motion for rehearing overruled.