E. J. ULBRICHT ET AL V. LINDA LOU FRIEDSAM,

No. A-6992. Decided June 24, 1959.
(325 S.W. 2d Series 669)

608

*Hammond & Hammond,* of Burnet, *Julius F. Franki,* of Austin, for petitioners.

The Court of Civil Appeals erred in holding that the contour line was a boundary and that petitioners acquired no title below that line in the bed of the lake. Since said contour line was the shore line of the lake, and the deed conveyed land abutting on lake Buchanan, it conveyed respondent-grantor's title in the bed of the lake between the margin of the lake and the bank of the original Colorado River. Stover v. Gilbert, 112 Texas 429, 247 S.W. 841; State v. Balli, 144 Texas 195, 190 S.W. 2d 71; State v. Bradford, 121 Texas 515, 50 S.W. 2d 1065; Mitchell v. Castellaw, 151 Texas 56, 246 S.W. 2d 163.

*Bryce A. Taylor,* of Burnet, for respondent.

MR. JUSTICE GRIFFIN delivered the opinion of the Court.

Petitioners, E. J. Ulbricht, V. S. Heckman and Dudley Prade, as plaintiffs, filed this suit in the District Court of Burnet County, Texas, against respondents, Linda Lou Friedsam and R. M. Jones, defendants. The suit was in trespass to try title to 386 acres of land located in Burnet County and situated adjacent to Lake Buchanan. This tract was set out by metes and bounds and called for the 1020 foot contour line above mean sea level as the boundary of that part of the land lying along the shore of Lake Buchanan. Petitioners also sought to recover the title to the lands in the John B. Loveridge Survey No. 90 and the John St. Clair Survey No. 54 in Burnet County, Texas, which were formerly a part of the Friedsam Ranch and which surveys are adjacent and contiguous to the 386 acres, more or less, and which lie between the 1020 foot contour line and the original bank of the Colorado River.

Plaintiffs, in a second count, sought, under the Uniform Declaratory Judgments Act, to recover the right of ingress and egress to their lands from the waters of Lake Buchanan, as well as the right to use their alleged lake front property for such uses as were owned, claimed and enjoyed by defendant Friedsam and her predecessors in title, prior to and at the time this defendant conveyed the 386 acres to Ulbricht and Heckman.

By a third count in their petition plaintiffs sought to reform the deed whereby defendant conveyed to Ulbricht and Heckman the 386 acres; more or less, by metes and bounds so that plaintiffs would recover the right of ingress and egress from Lake Buchanan to their 386 acres, the title to the land below the 1020 foot contour line, and the rights in and to the use of the lake shore which defendant owned at the time of her deed. For a statment of plaintiffs' claims in more detail we refer to the opinion of the Court of Civil Appeals.

The trial was before the court without a jury and at the end of the testimony judgment was rendered in favor of plaintiffs against the defendants for recovery of title to all of the land sued for. Defendant R. M. Jones' rights as a lessee were recognized, and he has not appealed. The Court of Civil Appeals reversed the trial court and remanded the cause for the purpose of trial on plaintiffs' count for reformation, and denied plaintiffs' recovery except as to the 386 acres. 315 S.W. 2d 442. The term defendant will hereafter refer only to Linda Lou Friedsam.

In 1930, one Cassie A. Freidsam, mother of defendant, was the owner of a ranch in Burnet County, Texas, consisting of some 6,000 to 8,000 acres and of which ranch the 386 acres here in controversy were a part. On August 14, 1930, Cassie A. Freidsam, et vir, by deed, granted to Emory, Peck and Rockwood Development Company a perpetual easement and right to overflow, inundate and make use of for all purposes her land lying below the 1020 foot contour line in connection with the operation of a dam to an elevation of 1020 feet above mean sea level. Other and more full recitations were made and the lands were described by metes and bounds. The Lower Colorado River Authority (hereinafter referred to as L.C.R.A.) was at the time of the trial of this cause and is now the owner of all rights of the grantees under this instrument, and will be referred to herein as the original grantee of such rights.

Cassie A. Friedsam died prior to the conveyance of the 386 acres to plaintiffs. She left surviving her defendant, Linda Lou Friedsam; a son, Herman Friedsam, and her husband. In a partition of the Ranch Linda Lou received some 2,700 acres which included the 386 acres in this suit. The partition deed by appropriate language expressly conveyed to Linda Lou all easements, reversions, uses and all other right, title and interest in and to all lands covered by Lake Buchanan, in accordance with the instrument, (referred to by volume and page in the Deed Records of Burnet County, Texas) creating the per-

petual easement with all and singular the rights, hereditaments and appurtenances thereto in anywise belonging.

On June 18, 1947, Linda Lou, by warranty deed, conveyed the 386 acres in this suit to Ulbricht and Heckman. This deed described the 386 acres by metes and bounds. After certain calls following existing fences the deed states:

"Thence up and down the meanders of Cedar Springs Creek with meanders of the 1020 elevation contour line which is a partitioned fence line between Dorbandt and this tract;

"Thence West across a peninsula 440 feet to the intersection of the 1020 contour line on the west side of the peninsula;

"Thence, Southwesterly with the meanders of the elevation 1020 feet contour line to its intersection with the West line of the F. C. Rector Survey No. 403, which is the West line of the Dorbandt tract;

"Thence, North along a partition fence a distance of approximately 975 feet to the point of beginning * * *."

That part of the call for "the meanders of Cedar Springs Creek with meanders of the 1020 elevation contour line *which is a partitioned fence line between Dorbandt and this tract,*" (emphasis added) is a mistake when applied to the ground as neither the plat relied on by all parties nor any testimony shows a fence on the 1020 foot contour line. A reference to the contract of sale to the 386 acres introduced in evidence without objection by plaintiffs shows that this call should read "Thence up and down the meanders of Cedar Springs Creek with the meanders of the 1020 foot elevation contour line *to its intersection with the previous West coursed line* which is a partitioned fence line between Dorbandt and this tract." (Emphasis added.) The underscored language of the contract above was omitted in the deed. This omission was an obvious mistake since no fence existed along the 1020 foot contour line. The testimony shows that no markers were found on the 1020 contour line. The surveyor testified that he did not run the 1020 contour line on the ground, but used this call as the correct one because it was used in the original grant from Cassie A. Friedsam to L.C.R.A. The record, as a whole, shows that the calls for the 1020 contour line in all instruments were calls for the water's edge when Lake Buchanan was full. The 1020 contour line was the highest reach of the perpetual easement to

overflow given by Cassie A. Friedsam to L.C.R.A. It was the dividing line between the waters of the Lake and the dry uplands.

Plaintiffs base their claim to recover the title to the land below the 1020 foot contour line on two propositions. First, that the 1020 contour line was intended as a meander line conforming to the sinuosities of Lake Buchanan, and not as a boundary line of the tract conveyed; second, since the deed conveyed land abutting on the waters of Lake Buchanan, it conveyed defendant's title to the lake bed between the 1020 foot contour line and the submerged east bank of the Colorado River, and upon the further fact that the trial court, after hearing the evidence, rendered judgment in their favor. In support of the first proposition, plaintiffs contend that the description in the deed refers to the boundary line of the 1020 foot contour line as a meander line rather than a fixed boundary line. Also, plaintiffs say that the 1020 foot contour line is the upper edge or high water mark of the lake and therefore it must follow the sinuosities of the lake. From these facts plaintiffs claim the 1020 foot contour line must be a meander line. A meander line means more than that it merely meanders along the edge of the lake. "The general rule, subject to various qualifications, is that the meander lines of a government survey are not run as boundaries of the tract surveyed, but for the purpose of defining the sinuosities of the banks of the stream or other body of water, and ascertaining the quantity of land embraced in the survey; and the stream, or other body of water, and not the meander line, is the boundary." 11 C.J.S. 572, 573, Sec. 30-b. Should it be held that the 1020 foot contour line is a true meander line (as that term is defined in surveying, and in the cases herein cited), plaintiffs contend that it must follow that the deed of defendant conveyed all of the land owned by her below the 1020 foot contour line. This would be true if the same rule of law applicable to streams is applied to lakes. Strayhorn v. Jones, 157 Texas 136, 300 S.W. 2d 623, 631 (1957); Stover v. Gilbert, 112 Texas 429, 247 S.W. 841 (1923); State v. Atlantic Oil Producing Co., Texas Civ. App., 1937, 110 S.W. 2d 953, wr. ref.; McCombs v. McKaughan, Texas Civ. App., 1946, 195 S.W. 2d 194, wr. ref.; Dutton v. Vierling, Texas Civ. App., 1912, 152 S.W. 450, no writ history.

Where the facts are undisputed as to the location of a boundary line, it becomes a question of law for the courts to determine whether the boundary call is a meander line or a boundary line. Strayhorn v. Jones, supra; State v. Atlantic Oil

Producing Co., supra. Of course, if the description of the property as set out by the calls in the conveyance was specific and described land below the edge of the lake, the deed would convey to the limits of the field notes. It is undisputed that the 1020 foot contour line was selected by Cassie A. Friedsam to limit the extent of the L.C.R.A. easement. In the partition of the ranch among the heirs of Cassie A. Friedsam, the 1020 contour line was again set out as the dividing line between the lake and the upland. During all the time defendant owned the ranch, the 1020 foot contour line was recognized by her as the dividing line between the lake and the upland. In defendant's deed to Heckman and Ulbricht, she sets out the 1020 foot contour line as the boundary of the land she conveyed. Plaintiffs accepted the deed with this description. We hold that the 1020 foot contour line is not a meander line but is a boundary line for the 386 acres conveyed.

The second point on which plaintiffs rely for a recovery of title is as follows: Granted that the 1020 foot contour line is not a meander line but a fixed course and distance call, it still follows that the title to all the land below the 1020 foot contour line adjacent to the 386 acres described in the deed and owned by defendant at the time of her deed to plaintiffs passed to plaintiffs as a matter of law because the 1020 foot contour line is the upper edge, or water's edge of the Lake. This is claimed to be true because the 386 acres conveyed were adjacent to Lake Buchanan, and so described in defendant's deed to plaintiffs. This position of plaintiffs is well stated in a discussion found in 74 A.L.R. 599, and reading in part as follows: "As a general proposition it may be observed that the presumption that the grantor intends to convey all the land he owns under the water is very strong and expressions substantially to the effect that nothing short of an express reservation of the bed will overcome the force of the presumption are not uncommon in the cases. * * *." By "express reservation" is not meant a "* * * reservation in express terms, but a reservation inferable from the terms of the description."

It is elementary that unless the deed be ambiguous, it is the duty of all courts to construe the deed within its four corners. In such construction the court seeks the intention of the parties as shown by the deed. The deed before us is plain in its description of the property conveyed. The record shows it is some mile or mile and a half from the 1020 foot contour line to the original bank of the Colorado River. There is no language in the deed which conveys any land below the 1020 foot contour line. In

Farnham, *Waters and Water Rights*, Vol. 3, Sec. 369, p. 2533, it is stated:

"The rules with respect to boundaries upon artificial ponds are very similar to those governing boundaries on the streams on which the ponds are raised. If the pond is created by the damming back of the water of a natural stream a conveyance of land bounded by it will extend as far as the title of the grantor extends. If his title extends to the center, the grantee will acquire title to that point, but if [his title extends] only to the edge the deed will, of course, carry title no further. It makes no difference that the ordinary terms of boundary as 'along' or 'with' the pond are used; the title will nevertheless go to the center if the grantor owns to that point. And the age of the pond is immaterial."

See also Joslin v. State, Texas Civ. App., 1940, 146 S.W. 2d 208 (1), (3,4), wr. ref.; Cox v. Campbell, 135 Texas 428, 143 S.W. 2d 361 (1940); Haines v. McLean, 154 Texas 272, 276 S.W. 2d 777 (1955); 8 Am. Jur. 752, 757-758, Secs. 11 and 19; 11 C.J.S. 571, Sec. 27b(2); Tiffany, *The Law of Real Property* (3rd. Ed.) Vol. 4, p. 100, Sec. 995, and notes to 74 A.L.R. beginning at p. 597 for a full and clear discussion of this problem. However, there are many states in which the boundaries of a grant abutting and adjacent to a lake or other inland large body of water, cannot be extended to the center of the body of water whether such body of water is navigable or not, and the title to the submerged lands is owned by the grantor. In 74 A.L.R. 618(b)—*Lakes and Ponds*, it is stated: "* * * In considering the effect of a specific description of land with reference to a lake or pond upon the extent of the grant as to adjacent submerged land, it is important to bear in mind that in some jurisdictions the general presumption that a grantee of land bounded generally by a non-navigable body of water takes, in the absence of language limiting the grant, up to the center of the water, does not obtain with reference to land bordering on lakes and ponds, because of the difficulty or alleged impossibility of apportioning the beds of such waters among the riparian landowners. * * *."

In 1917 in the case of Welder v. State, Texas Civ. App., 196 S.W. 868, wr. ref., Texas aligned itself with those states refusing to extend the grant to the middle of the lake, or other body of water. In that case the State had granted to various parties its title to all of the lands adjacent to and abutting upon "Green Lake" situated in Calhoun County, Texas. These grants were

all made by·metes and bounds description. The descriptions stopped at the margin of the lake. The lake was one that was full of water in times of good rainfall and dry during periods of drought. The owners of the surrounding lands (whom we shall call riparian owners) were claiming title to the bed of the lake as against the State. The trial court, sitting without a jury, held the lake to be non-navigable and awarded the title to the lake bed to the State, but preserved the riparian rights of the land owners. No complaint was made to the latter part of the court's judgment. On appeal, the Court of Civil Appeals affirmed the judgment of the trial court, but upon different reasoning.

In the course of its opinion the Court of Civil Appeals discusses the question of whether the title of these riparian owners would extend to the middle of the lake. It pointed out that the field notes did not extend beyond the margin of the lake, and that the riparian owners received all the acreage that was awarded to them for which they had paid. Attention was called to the fact that under the grant the total acreage of the riparian owners totaled some 13,000 acres, while the area in the lake bed was some 4,927 acres in excess of the 13,000 acres. The court said:

"The issue in this case is not whether the state could grant title to land in the bed of a natural, permanent fresh water lake, but has it done so as to Green Lake? If so it is solely by reason of the fact that it has granted all of the land contiguous of any description in the grant which otherwise covers the bed of the lake. * * *."

The Court discusses the common law rule saying "* * * the land in front of a survey bordering on a large lake is not inconsiderable, but in many instances would exceed the area called for in the survey. While excess in quantity will be disregarded where the boundaries of a survey can be otherwise ascertained with reasonable certainty, yet, in the absence of such ascertainment, quantity may be looked to in determining the boundaries. Scott v. Pettigrew, 72 Texas 328, 12 S.W. 161 * * *," 2nd. col., p. 870(4). The court concludes that the common law doctrine of extending the call for a non-navigable stream to the center thereof, does not apply to boundary calls for a lake. The opinion states that one reason for not extending this common law doctrine to land adjacent and abutting a large lake is the practical impossibility of partitioning the lake in accordance with such doctrine.

Plaintiffs seek to distinguish the Welder case from the case at bar by virtue of the fact that the State was the owner of the lake bed as well as the surrounding lands at the time the grants were made, and the plaintiffs claim that this being true a presumption follows that the State did not part with title to the lake bed. That statement is true, but the case does not turn on that fact as much as on the inapplicability of the common law doctrine. In its opinion on motion for rehearing the Court said, "However, as appears from our opinion herein, we would have affirmed the judgment of the trial court without reference to whether or not Green Lake is navigable." The Welder case is the only Texas case cited by either party on the question of extension of boundaries into a lake bed. While the refusal of a writ of error in 1917 did not mean what it does now, it meant that the Supreme Court was satisfied with the correctness of the judgment rendered. A check of the Welder case in Shepard's Southwestern Citations shows that it has not been questioned or overruled and that it has been cited by the Supreme Court on other points of law.

We hold that the rule laid down by the Welder case as to extensions of boundaries into a lake is the correct rule of law in this State. We find nothing expressed in the deed to the 386 acres of land from defendant to plaintiffs showing any intention to convey title beyond the 1020 foot contour line.

■ We now come to plaintiffs' action for a declaratory judgment establishing their right to use the land below the 1020 foot contour line for ingress and egress to their property; to graze their cattle upon so much of this land as may not be under water; for all rights with respect to the 386 acres as were reserved by Cassie A. Friedsam in her deed to L.C.R.A.; for the right to maintain and construct all such structures, buildings and facilities along the water's edge of Lake Buchanan as may be necessary and proper in the use of their said land as lake front property to which they may be entitled under their deed from the defendant to the 386 acres. The Friedsam Ranch and the portion received by defendant in the division of the Ranch between herself and her brother was used for the purpose of pasturage for livestock. That was its use at the time of the sale of the 386 acres to Ulbricht and Heckman. There were no water wells on the 386 acres and the livestock pastured on the 386 acres depended upon the lake for its water. There was no fence along the 1020 contour line to prevent livestock from grazing on that part of the land below the 1020 foot contour line when water did not cover the same. We take judicial notice of

the fact that for a tract of land to be used as a pasture for livestock, it is necessary that the animals have access to water. When not covered by water during the growing season, the exposed lake bed produced an abundance of grass and the livestock grazed thereon. The record contains testimony that during the negotiations for the sale of the 386 acres defendant pointed out to plaintiffs — as an inducement for plaintiffs' purchasing this property — that the 386 acres was lake front property, having some 3½ to 4 miles of lake front, and was much more valuable than mere pasture land. The plaintiffs paid three times more for the property as lake front property than ranch land in that vicinity was bringing at that time.

There is further evidence that in 1950 plaintiffs subdivided 20 acres of their 386 acres into lake front lots. These 20 acres were along the water's edge (the 1020 foot contour line) on the south side of Rocky Point peninsula. This subdivision was called "Rocky Ridge." Some houses had been built on the lots in this subdivision fronting on the Lake and the occupants of such houses and their guests had made use of the Lake for boating and fishing and other uses commonly made of lake front lots. Defendant lodged no protest to this use until very shortly before this suit was filed. Evidence was introduced that other property fronting on Lake Buchanan was used for erecting boat docks, fishing piers, bath houses and other recreational facilities; that these facilities were erected between the top edge or level of the lake and the actual water's edge at the time of building such facilities. There was also evidence that the lake front of the 386 acres was suitable for such lake front use. All of these conditions, except the subdivision of 20 acres of the 386 acres existed at the time of the sale of the 386 acres to Ulbricht and Heckman, and were apparent to anyone making an inspection of these 386 acres.

In the deed from Cassie A. Friedsam, et vir to L.C.R.A.'s predecessor in title, the grantors reserved for themselves "the right of access to the water line of the lake formed by such dam at all times and places, except over the embankment and dyke of the grantee, and the right to use such land to the water's edge," and then follows a waiver by grantors of any claim for damages by virtue of the covering with water of any part of grantor's land over which they had granted the right to overflow. It was further provided that "all of the easements and rights conveyed by virtue of this Section (a) of this conveyance shall be held to be covenants running with the land."

The instrument above referred to was a grant by Cassie A. Friedsam et vir conveying to the grantees a perpetual easement and right to overflow, inundate and make use of her land below the 1020 foot contour line for any and all purposes in connection with the construction, maintenance and operation of a dam to an elevation of 1020 feet above mean sea level, downstream from the Friedsam Ranch. The land to be overflowed was the land lying below the contour line at an elevation of 1020 feet above mean sea level between the dyke and spillway of such dam and the original banks of the Colorado River above such dam. Lake Buchanan was formed by the erection of the dam at the 1020 foot contour line. The 386 acres of land described in the deed from defendant to Ulbricht and Heckman herein involved are bounded on three side by Lake Buchanan. The stipulation sets out that Lake Buchanan has a spillway crest elevation of 1020 feet above sea level. The maximum level reached by the waters of Lake Buchanan was on July 27, 1938 which was at 1020.5 feet above sea level. The minimum level of the Lake (since it was first filled by the floods of 1938) was in September, 1952, when it reached only 982.4 feet above mean sea level. Fluctuations of the lake level are influenced by rainfall and drought as well as by the conditions under which L.C. R.A. is required to operate in carrying out its purposes. Thus we see that we have a lake with a fluctuating shore line; the lake level goes up and down and as it does so it covers or uncovers the land which is described in the instrument creating the easement to overflow all land below the 1020 foot contour line.

From a reading of the instrument creating the easement and of the stipulation with regard to Lake Buchanan it is clear to us that the dividing line between Lake Buchanan and the upland is the 1020 foot contour line. All below that line is a part of the lake and all above that line is upland. This is subject, of course, to the specific reservation above set out by Cassie A. Friedsam et vir of certain rights as to the land below the 1020 foot contour line in the instrument granting the easement to L.C.R.A.'s predecessor in title. Defendant's deed to Ulbricht and Heckman contained no exceptions or reservations of any easements or rights of any kind or character, except 1/16th minerals and a vendor's lien. No mention was made of the L.C.R.A. easement. The deed described the land as being "adjacent to the waters of Buchanan Lake" and contained a metes and bounds description of the land conveyed and stated to be 386 acres, more or less. The correct rule of law governing this

phase of this case is stated in 28 C.J.S. 687, et seq., *Easements,* Sec. 31 as follows:

"Where the owner of an entire tract of land or of two or more adjoining parcels employs a part thereof so that one derives from the other a benefit or advantage of a continuous, permanent, and apparent nature, and sells the one in favor of which such quasi easement exists, such easement, being necessary to the reasonable enjoyment of the property granted, will pass to the grantee by implication."

In Mitchell v. Castellaw, 151 Texas 56, 246 S.W. 2d 163 (4,5), (1952), this Court said:

"It is universally recognized that where the owner of a single area of land conveys away part of it, the circumstances attending the conveyance may themselves, without aid of language in the deed, and indeed sometimes in spite of such language, cause an easement to arise as between the two parcels thus created— not only in favor of the parcel granted ("implied grant") but also in favor of the one remaining in the ownership of the grantor ("implied reservation"). The basis of the doctrine is that the law reads into the instrument that which the circumstances show both grantor and grantee must have intended, had they given the obvious facts of the transaction proper consideration. * * *."

Numerous authorities sustain this proposition, among which see Howell v. Estes, 71 Texas 690, 12 S.W. 62 (1888); Miles v. Bodenheim, Texas Civ. App., 1917, 193 S.W. 693, ref.; El Paso Land Improvement Co. v. Crawford, Comm. App., 1927, 292 S.W. 518, 520 (holding approved); Neilon v. Texas Trust & Security Co., Texas Civ. App., 1941, 147 S.W. 2d 321, dism., cor. judg.; James v. Gray, Texas Civ. App., 1955, 281 S.W. 2d 114, ref., n.r.e.; 17A Am. Jur. 652-654, *Easements,* Secs. 41 and 42; Restatement of the Law Property, pp. 2977, et. seq., Sec. 476; 28 C.J.S. 691, 693, *Easements,* Sec. 33; 14-B Texas Jur. 600, *Deeds,* Sec. 147.

On July 27, 1947, the defendant here, as plaintiff, filed a suit in Burnet County, Texas, against the plaintiffs herein, Ulbricht and Heckman, as defendants, in which she sought to set aside, because of fraud, the provisions in her original deed to Ulbricht and Heckman conveying the 386 acres whereby a perpetual easement was granted across the remaining portion of her ranch for ingress and egress to the 386 acres conveyed. R. M. Jones,

a tenant of Linda Lou's, intervened and in general alleged a similar cause of action to that alleged by Linda Lou against Ulbricht and Heckman. This suit was numbered 3783, and was ended by the entry of an agreed judgment whereby, among other provisions, the plaintiff and intervenor therein gave full recognition to the right of Ulbricht and Heckman to use Lake Buchanan as a means of ingress and egress to their land conveyed to them by their purchase deed.

■ Under the record herein we hold that the plaintiffs shall recover the rights of defendant to the quasi-easement for use and enjoyment of the surface land below the 1020 contour line limited to the extent that the same may be reasonably necessary to the use and enjoyment of the land as lake front property, subject to the rights of the L.C.R.A. We further hold that the plaintiffs have the right to pasture their cattle on the land below the 1020 foot contour line in front of their 386 acres, down to the water's edge; and that plaintiffs have ingress and egress to their property from Lake Buchanan.

In their deed to Prade, plaintiffs, Ulbricht and Heckman, specifically conveyed to him the 386 acres plus all easements, ways of ingress and egress, water rights, and all other property rights of every character which they owned in connection with the land and premises—the 386 acres—described in such deed.

On rehearing the Court of Civil Appeals ordered a general remand of the cause in order that plaintiffs might have a trial of their reformation count. We have examined the plaintiffs' petition on which they went to trial and their count for reformation includes the claim for title to land in the Loveridge and St. Clair Surveys "between the 1020 foot contour line and the water's edge of Lake Buchanan" as well as the right of ingress and egress to their lands from Lake Buchanan, and the right to build, construct and maintain on their lake front land at all times such buildings, structures and facilities as are useful and appropriate for lake front property. The opinion here rendered establishes all the rights which plaintiffs claimed in their count for reformation save and except their claim to the title to the land below the 1020 foot contour line. This claim to the title to such land may be tried when this cause is again before the trial court. Under this state of the record, it is necessary that we affirm that part of the judgment of the Court of Civil Appeals reversing and remanding this cause to the trial court. Proceedings in the trial court shall be consistent with the legal principles declared herein.

Costs are divided one-half against plaintiffs, Ulbricht, Heckman and Prade, and one-half against defendant, Linda Lou Friedsam.

The judgment of the Court of Civil Appeals is affirmed in part and in part reversed and rendered.

Opinion delivered June 24, 1959.

MR. JUSTICE CALVERT, concurring.

I concur in the judgment entered.

I disagree with that portion of the opinion in which it is held that the calls in the deed "with the meanders of the elevation 1020 contour line" is not a meander line. That holding is unnecessary to a decision of the case, and is wholly immaterial. In adopting the rule of Welder v. State the majority tacitly recognizes that the plaintiffs could not have acquired under their deed from the defendant any part of the bed of Lake Buchanan, *even if the calls for the 1020 contour line do constitute meander lines*. That being true, a holding that the call is not a meander line is a decision of a purely academic question, but it is one by which I would not care to be bound in a case wherein such a call was material to its decision.

Opinion delivered June 24, 1959.

MR. JUSTICE SMITH, joined by JUSTICE GREENHILL, dissenting.

The principles of law followed in the case of Welder v. State, Texas Civ. App., 196 S.W. 868, wr. ref., do not apply and are not controlling in the instant case. Both the majority and the concurring opinions rely upon the Welder case.

It seems to me that the majority erroneously concludes that this state is committed to what it regards as the holding of the Welder case. There is no authoritative holding of this Court on the subject. The Welder case is an opinion of a Court of Civil Appeals. The application for writ of error was marked "refused" by this court at a time when the refusal of the application did not mean that this Court approved of the opinion of the Court of Civil Appeals. Koepsel v. State Board of Medical Examiner, 1959, 159 Texas 479, 322 S.W. 2d 609.

That portion of the Welder opinion relied on by the majority in this case is against the weight of authority in the United States. 8 American Jurisprudence 754, Boundaries, Sec. 14; 56 American Jurisprudence 621, Waters, Sec. 151.

The rule of the majority of American courts is set out in 4 Tiffany on Real Property (3rd ed.) 100, Sec. 995.

"* * * * In the ease of a conveyance of land bounded by a lake or pond, the same general rule, by weight of authority, applies, and the conveyance prima facie passes the soil so far as the grantor owns, whether this ownership extends to the center of the lake or pond, to the high watermark, or to an intermediate point. * * * * ."

To the same effect is Angell on Water Courses 40, Sec. 41; Gould on Waters 380, Sec. 196.

Granting that this Court is committed to the Welder case, I contend it is not in point. The opinion in that case states the issue to have been: "The issue in this ease is not whether the state could grant title to land in the bed of a natural, permanent fresh water lake, but has it done so as to Green Lake?" The State of Texas was claiming title to some 5,000 or 6,000 acres (Green Lake) on the theory that the calls in the surveys surrounding the lake having expressly limited the extent of the grant in each instance to the edge or margin of the lake clearly demonstrated that there was no intention to grant land in the bed of the lake. The grants to the lands surrounding Green Lake were made pursuant to statutes which have been construed as prohibiting grants under such lakes. This situation is not true here. In the present case, the State has long since parted with the title to not only the 386 acres involved, but also to all of the land extending to the Colorado River. I agree with the trial court's finding that the contour line was a meander line and not a boundary line. There is no question but that respondent sold land abutting on Lake Buchanan. Respondent by her deed conveyed the title she owned. That title was the title which had passed by mesne conveyances from the State of Texas. In the Welder case, the title to the bed of Green Lake was at all pertinent times vested in the State of Texas. In our case, the title to the bed of Lake Buchanan, as well as the 386 acres, had been divested out of the State and the respondent and her predecessors were thereafter the owners of all of such land. This means that on the date of the deed from respondent she owned the land to the Colorado River. In recognition of such title, the

Lower Colorado River Authority obtained a permanent easement for flooding the lands up to the 1020 foot contour line. No similar facts can be found in the Welder case. In the Welder case there was no evidence of an intention to convey any portion of Green Lake, whereas, in this case, the evidence is conclusive that the grantors were the owners of all of the land involved below the 1020 foot contour line and the bed of Lake Buchanan. The facts in connection with the Lower Colorado River Authority easement and the description of the grants of which the land is a part forcefully demonstrate that the land below the 1020 foot contour line was conveyed to the petitioners.

The Lower Colorado River Authority easement as it affects the land in controversy was originally procured by Emory, Peck and Rockland Development Company from Cassie A. Friedsam et vir., by instrument dated August 14, 1930. The easement was subsequently transferred to Lower Colorado River Authority. It conveys a perpetual easement and right to overflow, inundate, and make use of for any and all purposes in connection with the maintenance and operation of a dam to an elevation of 1020 feet above mean sea level, the lands therein described. That part of the land here involved, which is below the contour line, is included in the fieldnote description attached to the easement. The easement also provides that the grantors reserved the right of access to the water line of the lake formed by such dam at all times and places, except over the embankment and dyke. Respondent's predecessors in title further in said easement reserved the right to use such land to the water's edge. Since the Lower Colorado River Authority has never owned the title to the land involved in the bed of Lake Buchanan, and since the respondent and her predecessors in title were the owners of all the land in controversy, including the land below the 1020 foot contour line, and since such land is a part of two surveys abutting the Colorado River, and since all the facts show an intention to convey to petitioners all the land, I see no reason for not so holding. There is no justification in fact or in law for the action of the majority in remanding this case for a trial on the alternative count for reformation of the deed. The petitioners contend that the contour line in the deed was inserted in the description by the respondent-grantor as a meander line. The surveyor she employed to prepare the field notes testified that the usual method employed by surveyors in describing land bounded by a river, a lake, or other body of water was by use of a meander line. Such a line is normally surveyed by running a transit line on the ground from point to point, on or near the bank, some distance from the edge of the water, and roughly following the siuousi-

ties of the shore. The surveyor adopted the 1020 foot contour line as an adequate substitute for an actually surveyed meander line. If he had actually surveyed a meander line, it would have involved considerable expense to respondent because of the long, broken, and rugged shore line. There are other facts which take this case out from the rule followed and announced in the Welder case. These facts and circumstances, which to me have a direct bearing surrounding the execution of the deed from respondent to petitioners, are set out in petitioners' brief and copied here:

"Of paramount significance here is the fact that the uppermost portion of the ranch, the land conveyed by Respondent to Petitioners Heckman and Ulbricht, and referred to by the witnesses as Rocky Ridge (or Rocky Point) and Cedar Springs Pastures, was cut off from the rest of the ranch by the formation of the lake. This results from the fact that there is a depression or valley referred to in the record as the 'North Slough,' and extending across the fence line into Dorbandt's land at the point marke 'X' on the large L.C.R.A. map, which became filled with water as part of the lake. Rocky Ridge and Cedar Springs Pastures, the cut-off part of the ranch is largely a peninsula projecting into the waters of the lake. For the court's convenience a map of this part of the ranch and the surrounding area is attached to this Application.

"While Rocky Ridge and Cedar Springs Pastures had some value as ranch property at the time of the deed the greatest value and highest and best use of this land was for the lake front development purposes. Respondent, desiring to raise some money, was motivated to sell this portion of the ranch because it was isolated from the rest of her property. She accordingly authorized Mr. Gibbs, according to his testimony, 'to sell that portion of the ranch lying above the slough.' Respondent's letters to Mr. Gibbs show clearly that she was aware of the additional value of this land because of its lake frontage, and that she authorized Mr. Gibbs to sell Rocky Ridge and Cedar Springs Pastures. This land, i.e., Rocky Ridge and Cedar Springs Pastures, was a specific and definite part of the ranch; and there is no evidence whatever to show that the beaches, or the land below the 1020' contour line was not a part of these pastures. The property was used *in solido* including the beaches, and no fence separated the beaches from the upland. There were fences along the inland boundaries of the property — the one on the north line extending into the lake; but the water in the lake was the only visible demarcation of the lakeward boundaries.

Up to the time of the deed the only use which had been made of the property was for ranch purposes. There were no water wells, and from the standpoint of grazing land, the lake front was necessary to provide livestock access to the water. In offering the property to Petitioners Heckman and Ulbricht, Mr. Gibbs as Respondent's agent, offered it to them in its entirety as lake front property, exhibiting the large L.C.R.A. map upon which it was graphically demonstrated that the land offered abutted upon the waters of the lake. Both Heckman and Ulbright coroborated (sic) Mr. Gibbs' testimony in this respect, and stated that he represented it had several miles of lake front —'approximately 3½ to 4 miles.' They said he offered them that portion of the ranch lying north of the slough. In Waco, according to Mr. Ulbricht, Respondent represented that the property being sold 'had a good lake front,' that it would make a good lake front development; and she also said that 'if the lake goes down you will have more land than indicated' on the map. As ranch land the property was worth considerably less than it was for lake front development purposes, the latter being the purpose for which Heckman and Ulbricht, bought it. The price they paid for it, $15,000.00 was three times more than Respondent could have sold it to her neighbor, Dorbandt, for ranch purposes and Heckman and Ulbricht would not have purchased the land or paid that price without frontage on the lake."

Respondent's deed of June 18, 1947 describes the land conveyed as adjacent to the waters of Buchanan Lake, and in the fifth call of the field notes, being the first call for the contour line, it states: "Thence up and down the meanders of Cedar Springs Creek with the meanders of the 1020 elevation contour line." After crossing a small peninsula 440 feet in width, the field notes continue around the main peninsula with the meanders of the 1020 foot contour line. Thus, the deed shows on its face, in its first references to the contour line, that this line was intended as synonymous with a meander line of the lake, since the mouth of the creek, like any of the sloughs and other indentations along the lake shore, is obviously a part of the lake.

Another significant fact showing that respondent conveyed the land below the 1020 foot contour line is that, while expressly reserving 1/16th of the minerals, the deed contains no reservations of any of respondent's rights, title, or interests below the 1020 foot contour line, being that part of land encumbered by the Lower Colorado River Authority easement. There is other evidence, in addition to that pointed out heretofore, which sup-

ports the trial court's finding that the deed was intended to convey land abutting upon Lake Buchanan. A careful reading of the Welder case indicates to me most conclusively that the case has no application to the record as made in the present case. In the Welder case, the land under Green Lake was never conveyed. In the present case we have a conveyance by respondent, a private individual, of land bordering upon an easement, the Lower Colorado River Authority easement, with the grantor (respondent), not the state, owning title under the easement. In other words, respondent's fee simple title extended beyond the contour line to the east bank of the Colorado River. It seems to me that in such a situation, where the deed, as here, describes the land to the easement and no further, the title should extend to the land under the easement also. See Joslin v. State, Texas Civ. App., 146 S.W. 2d 208, wr. ref.; Rio Bravo Oil Co. v. Weed, 121 Texas 427, 50 S.W. 2d 1080, 85 A.L.R. 391; Cox v. Campbell, 135 Texas 428, 143 S.W. 2d 361; Cantley v. Gulf Production Co., 135 Texas 339, 143 S.W. 2d 912; Haines v. McLean, 154 Texas 272, 276 S.W. 2d 777.

The petitioner's position should not be denied merely because the application of the established rules governing this case would incorporate into their deed additional acreage. See the cases of Burkett v. Chestnutt, Texas Civ. App., 212 S.W. 271, no writ history (200 acres excess); McCombs v. McKaughan, Texas Civ. App., 195 S.W. 2d 194, wr. ref. (excess 597.61 acres); State v. Balli, Texas Civ. App., 173 S.W. 2d 522, 144 Texas 195, 190 S.W. 2d 71 (excess 19.35 leagues — 84,132 plus acres). Value of the land in the future seems to have no relevancy in determining the question here involved.

The deed involved here should be construed just as though Lake Buchanan was never created. The deed conveys land to the bank of the Colorado River. In the case of Dutton v. Vierling, Texas Civ. App., 152 S.W. 450, no wr. history, it was held that where land deeded by metes and bounds includes or touches the bank of a creek or river, although no reference is made to the creek or river, it will be presumed that the intention was to convey to the middle of the stream.

This Court announced the correct rule and the one applicable here, in the case of Strayhorn v. Jones, 157 Texas 136, 300 S.W. 2d 623, 634, when it said:

"We hold that when a private person (including corporations, etc.) conveys title to land owned by him *abutting* a stream

—whether navigable or not—such conveyance passes to the grantee (*unless the conveyance clearly shows* a contrary intention) title to the one-half of such stream bed abutting his land, subject, 'of course, to whatever rights the State of Texas may have in the stream bed. * * *."

In this case we held that under the meander-line theory, the river, and not the line along the bank or the survey line as relocated on the ground, was the boundary and that the deeds conveyed title to the center of the stream. Under this holding, petitioners are entitled to judgment for the land below the 1020 foot contour line as well as the 386 acres. It naturally follows that petitioners should have all the rights not now held by Lower Colorado River Authority under its easement. Petitioners own the legal title, subject only to the easement. I would enter judgment for petitioners for the 386 acres, and also award them title to the lands in the John B. Loveridge Survey No. 90 and the John St. Clair Survey No. 54 in Burnet County, Texas, which were formerly a part of the Friedsam Ranch and adjacent and contiguous to the 386 acres, and being the lands lying below the 1020 foot contour line and extending to the bank of the Colorado River. In my opinion, the trial court was not in error in granting petitioners title to the land below the 1020 foot contour line and to the bed of the river, and in granting them the right of access to the waters of Lake Buchanan when the water at any time should be for any reason below such line.

Opinion delivered June 24, 1959.