**CAPITOL ROD & GUN CLUB, et al., Appellants,**

v.

**LOWER COLORADO RIVER AUTHORITY, Appellees.**

No. 13220.

Court of Appeals of Texas, Austin.

Oct. 7, 1981.

Rehearing Denied Oct. 28, 1981.

Laurin C. Currie, Rohde & Currie, Austin, for appellants.

Dennis Reese, Small, Craig & Werkenthin, Austin, for appellee.

## ON MOTION FOR REHEARING

SHANNON, Justice.

The opinion of this Court handed down on July 8, 1981, is withdrawn, and the following opinion replaces it.

Appellee Lower Colorado River Authority (LCRA) filed suit in the district court of Travis County seeking a judgment declaring the rights of LCRA and appellant Capitol Rod and Gun Club (CRGC) in and to a part of a 253.69-acre tract of land located between the 670-foot and 715-foot contour line above Lake Travis. LCRA derives its claim to the land from a deed to it by Travis Land and Cattle Company (TLCC), while CRGC derives its claim from an easement instrument from LCRA to TLCC, both instruments being dated December 14, 1939. The other appellants intervened in the suit in alignment with CRGC.[1] LCRA claims ownership in fee simple subject to certain specific rights in appellants by virtue of the said easement. Appellants, to the contrary, claim entitlement to the exclusive use and occupancy to the property in question subject only to LCRA's right to inundate the land in connection with its operation of Mansfield Dam. The district court rendered summary judgment favorable to LCRA declaring the rights of the parties and granting injunctive relief. This Court will affirm the summary judgment.

The 670-foot and the 715-foot contour lines are lines 670 and 715 feet above mean sea level, respectively. At the time these lines were established, LCRA was in the process of constructing Mansfield Dam across the Colorado River west of Austin and downstream from the land in controversy. The waters backed up from that dam form what is now known as Lake Travis.

The construction of Mansfield Dam was a federally funded and constructed project. Initially, the federal government required only that LCRA obtain flowage or inundation rights in and to land that would be subject to flooding from the operation of Mansfield Dam. Pursuant to that policy, LCRA obtained an easement by instrument dated March 27, 1939, from TLCC to inundate approximately 176.92 acres of land situated below the 670-foot contour line. That easement was granted upon the following terms and conditions, among others:

"[TLCC] shall have the exclusive right to the use of the surplus of said land to the water's edge of any lake at all times, and shall at all times have access to said lake for the purpose of boating and fishing, and for other lawful purposes."

"[LCRA] shall have no right, and shall not at any time erect or construct any fence along the contour line and the water's edge, but the same shall remain open at all times."

Thereafter the Board of Directors of LCRA determined to increase the height of Mansfield Dam to provide a spillway of 715 feet. In response to the insistence of the federal government, LCRA adopted a policy on October 19, 1939, that all land acquired thereafter must be in fee simple and that no further purchase of easements would be approved. There were many tracts thereafter obtained by LCRA in fee simple, one of which was that obtained from TLCC.

On December 14, 1939, TLCC conveyed to LCRA by general warranty deed the 253.69-

---

1. The intervenors are: W. P. Crow, Jr., and wife, Sandra Crow; Glen Hoegemeyer and wife, Geraldine Hoegemeyer; George W. Prel- lop and wife, Roseline C. Prellop; Russell Rowland and wife, Evelyn Rowland; and Anthony Neidhart and wife, Rose Ann Neidhart.

acre tract lying between the 670-foot and 715-foot elevation contours. That deed read in part:

"It is agreed that [LCRA] shall at no time build any fences or other obstruction which will prevent [TLCC], its heirs and assigns from crossing said land to reach other land owned by [TLCC], or from reaching the waters edge of the lake, provided however that this provision shall in no manner restrict or limit the right of [LCRA] or its successors or assigns, to inundate all or any part of said land with water and to keep the same or any part thereof inundated with water in any manner that it sees fit."

On the same date and as a part of the same transaction, LCRA gave TLCC an easement on the same tract, as follows:

"[The LCRA] hereby grants to said Travis Land & Cattle Company, and to its successors and assigns, a perpetual easement and right to use and occupy the land described hereinbelow for the purpose of placing and maintaining thereon boathouses, piers and docks, it being distinctly understood and agreed that such easement is subject to the right of the Authority to inundate and cover said land or any part thereof at any time it sees fit with water and to raise and lower the water placed thereon without any liability whatsoever to the Travis Land & Cattle Company, its assigns or its successors in title."

*   *   *   *   *   *

"There is also hereby granted to the Travis Land & Cattle Company, its successors and assigns, an easement of ingress and egress over and across the above described land in order to reach said docks, boathouses and piers and use the same for boating, fishing and pleasure purposes, and an easement across said land described hereinabove for the purpose of reaching the water's edge of the lake. . . . It is distinctly understood and agreed that the above easements and each of them are granted subject to the right of the Authority to maintain and operate the Marshall Ford Dam in any manner that it sees fit and to impound water thereby and raise and lower such water in any manner it sees fit and to overflow and inundate with water all or any parts of the land described above at such times and in such manner as the Authority may see fit without any claim against the Authority by reason of the same."

"To have and to hold the above easements, subject to the restrictions set out herein, unto the Travis Land & Cattle Company, its successors and assigns forever."

"The Travis Land & Cattle Company by the acceptance of this easement agrees that in the event a subdivision is laid out embracing all or a portion of the land and premises belonging to the Travis Land & Cattle Company and adjacent to the land hereinabove described, that said Travis Land & Cattle Company will leave open lots fifty feet (50 feet) in width fronting on the 715' contour line, at distance averaging not over 1,000 feet apart, and will provide a roadway to said lots so left open, where roadways are not otherwise available in order to afford access to the lake by the Lower Colorado River Authority and the public; this clause, however, not to apply to the portions of the land belonging to the Travis Land & Cattle Company not included in any subdivision."

In 1944, TLCC sold to R. E. Stevenson that portion of the land in which appellants claim an interest. In its deed to Stevenson, TLCC expressly excepted "all those easements and rights" below the 670–foot line that it had first conveyed to LCRA on March 27, 1939; expressly excepted from the conveyance "those premises" described in its December 14, 1939, deed to LCRA; and expressly included "those easements and rights" granted to it by LCRA in the December 14, 1939, easement.

On August 21, 1946, R. E. Stevenson wrote the general manager of LCRA and made the following request:

"In 1939 Travis Land & Cattle Company, of which I was the owner, conveyed ap-

proximately 253 acres of land to the Authority, retaining easement rights. I should now like to have the Authority convey me the land, retaining easement rights. This is important to me as I am trying to develop the land."

"I have set aside and designated in Lakehurst Subdivision 7 tracts of land as park sites—three of which have roads built to the water's edge. In addition, there are two public roads built to the water's edge."

"As other parts of Lakehurst Subdivision are developed, there will be other parks designated and other roads built."

LCRA refused Stevenson's request for the LCRA to convey to him the land in exchange for an easement.

In 1956, Stevenson's son, Howard E. Stevenson, subdivided a part of the land in question into Big Bee Creek Subdivision No. 2. The subdivision plat depicted the 715-foot contour line running through the lots, and stated:

"Lots enclosed by solid lines conveyed by fee. Lots enclosed by jotted lines a perpetual easement, said easement recorded in Volume 641, page 625, Deed Records of Travis County, Texas."

In 1956, CRGC also acquired its property from Howard E. Stevenson. The property above the 715-foot contour line, about 71.34 acres, was conveyed by general warranty deed, and a title policy obtained on that portion. Stevenson gave a quitclaim to CRGC with respect to that property lying below the 715-foot line.

Capitol Rod and Gun Club and the intervenors built substantial structures on the involved land. Those buildings include large double-story houses, small houses, mobile homes, and sheds.

The rights of the parties to the land below the 670-foot line and above the 715-foot line are not in dispute.

The general warranty deed from TLCC dated December 14, 1939, formed the basis for the motion for summary judgment of LCRA. LCRA claimed further that appellants' use of the property was inconsistent, as a matter of law, with the rights vested in them by the easement dated March 27, 1939.

In response to the motion for summary judgment, appellants asserted many defenses: mutual mistake or legal fraud; implied reservation; implied easement; ambiguity of the easement; compliance with the easement; estoppel; laches or acquiescence; and limitation. In addition, appellants listed several objections to the form of appellee's motion for summary judgment and its summary judgment "proof."

The district court rendered final summary judgment declaring that the deed from TLCC to LCRA and the easement from LCRA to TLCC dated December 14, 1939, were clear and unambiguous. The deed conveyed to LCRA the fee simple title to the 253.69 acres subject only to the restriction that LCRA would at no time build any fence or obstruction that would prevent TLCC, its heirs and assigns, from crossing the land conveyed by the deed in order to reach other land owned by TLCC or from reaching the water's edge of the lake. The easement instrument conveyed to TLCC and its successors and assigns a non-exclusive perpetual easement and right to use and occupy the same 253.69 acres, but that the easement and right to use and occupancy was limited to only the right to place and maintain boathouses, piers and docks on the property, to use those structures for boating, fishing and pleasure purposes, and to use the balance of the 253.69 acres, upon which there were no boathouses, piers or docks, only for the purpose of ingress and egress in order to reach the boathouses, piers and docks and the water's edge of the lake.

The district court declared further that the terms contained in said deed and easement remain in full force and effect and are binding upon appellants. The court further enjoined appellants from excluding the general public from the property between the 670-foot and the 715-foot contour lines. Finally, the court found that appellants maintained structures on the property other than boathouses, piers and

docks and the court ordered appellants to remove such structures.

Appellants attack the summary judgment by thirteen points of error. As previously recounted, LCRA relied upon the 1939 deed and easement to establish, as a matter of law, its claim to the property. Appellants maintain that they came forward with summary judgment "proof" sufficient to raise at least an issue of fact with respect to one or more of their affirmative defenses. In this situation, the burden was on appellants, if they wished to avoid the granting of summary judgment against them, to adduce summary judgment "evidence" raising a fact issue concerning one of their affirmative defenses. *Nichols v. Smith*, 507 S.W.2d 518 (Tex.1974); *"Moore" Burger, Inc. v. Phillips Petroleum Co.*, 492 S.W.2d 934 (Tex.1972); *Gulf, Colorado & Santa Fe Railway Co. v. McBride*, 159 Tex. 442, 322 S.W.2d 492 (1958).

## MUTUAL MISTAKE AND LEGAL FRAUD

■ Appellants claim that the summary judgment "proof" established an issue of material fact as to their claim that the deed and easement of December 14, 1939, should be reformed since those instruments came about as a result of mutual mistake or legal fraud. This Court, however, is of the view that no issue of fact of mutual mistake or legal fraud was raised.

In this connection, it is of some significance that appellants' predecessor in title, Stevenson, recognized the nature of the interests conveyed when he sought by letter to acquire the fee from LCRA in exchange for an easement. The plats filed later, encompassing the intervenors' property, continued to recognize ownership of the fee above the 715–foot contour line and made specific reference to the 1939 easement document for the easement rights existing below the 715–foot line.

■ Legal fraud is the breach of some legal or equitable duty which, irrespective of moral guilt, the law declares fraudulent because of its tendency to deceive others, to violate confidence, or to injure public inter-

ests. *Archer v. Griffith*, 390 S.W.2d 735 (Tex.1965). A mutual mistake has been defined as "one common to both parties to a contract, each laboring under the same misconception; more precisely, it is one common to both or all parties, wherein each labors under the same misconception respecting a material fact, the terms of the agreement, or the provision of a written instrument designed to embody such an agreement." *Eggert v. American Standard Life Insurance Company*, 404 S.W.2d 99 (Tex.Civ.App.1966, no writ). One seeking reformation of an instrument based upon a mutual mistake has the burden to show: (1) the true agreement of the parties, for it is not enough to show that both parties were mistaken about some feature of their bargain; and (2) that the provision erroneously included into or omitted from the instrument was done by mutual mistake. *National Resort Communities, Inc. v. Cain*, 526 S.W.2d 510 (Tex.1975). A unilateral mistake made in the agreement will not constitute grounds for reformation. *Wheeler v. Holloway*, 276 S.W. 653 (Tex.Comm'n App. 1925, jdgmt. adopted); *Bifano v. Econo Builders, Inc.*, 401 S.W.2d 670 (Tex.Civ.App. 1966, writ ref'd n. r. e.).

In support of their theories of legal fraud and mutual mistake, appellants emphasize a series of communications between counsel for TLCC and LCRA officials; certain LCRA records; an affidavit of a former legal secretary; and certain deposition testimony. The record indicates that there is no person living with personal knowledge of an agreement between TLCC and LCRA that was different from that incorporated into the deed and easement of December 14, 1939. An examination of the letters and notes between counsel for the parties shows a number of proposals made by counsel for TLCC which would have permitted TLCC to erect structures on the property other than boathouses and would have permitted TLCC to enjoy exclusive use of the property for all lawful purposes. Counsel for LCRA rejected these proposals. TLCC's counsel then suggested other alternatives favorable to TLCC, including some form of lease-back

arrangement. Interoffice notes between LCRA officials show discussions of the purpose of the property, but there is nothing to indicate an agreement different from the one ultimately reflected in the deed and easement.

The above-mentioned affidavit was signed by Lutie Ruth Carter who was secretary to TLCC's counsel from 1925 to 1952. She examined the 1939 correspondence between the attorneys concerning the property and then gave her opinion that since the final deed and easement were different from her former employer's first suggestion, there was a mistake in the drafting of the final instruments. The deposition testimony was that counsel for TLCC and LCRA were friends and neither attorney would intentionally deceive the other, the implication being that since the final agreement, as reflected in the deed and easement, was not the same as initial negotiations, there must have been a mistake.

The exchange of letters and notes between the parties is couched in tentative language. None of the letters or notes purport to be a recitation of the terms of a final agreement. These documents do not constitute evidence of a final agreement between the parties different from that reduced to writing in the 1939 deed and easement or evidence that the terms of the 1939 documents were included therein by mutual mistake.

At best, the correspondence between counsel for the seller and the purchaser reflects the typical state of flux characteristic of any negotiation process. Terms are suggested, trade-offs are made, and ultimately a final agreement is incorporated into a written document. Nothing in the summary judgment proof indicates that the situation in this case was any different, or that the final deed and easement did not reflect the final agreement of the parties.

The affidavit of Lutie Ruth Carter is not evidence of any such agreement since she simply speculates about the intentions of the parties based upon her examination of the documents before the district court, and she had no independent recollection of the negotiations or the transaction.

It is said that the elements of legal fraud are (1) a false representation by the vendor to the vendee (2) made as an inducement to purchase (3) which results in actual deception of the vendee in reliance thereon. *Mason v. Peterson*, 250 S.W. 142 (Tex. Comm'n App.1923, jdgmt. adopted). Appellants reply upon the same summary judgment proof to support legal fraud as they did for mutual mistake. Appellants fail to make out a case for legal fraud in that there is nothing in the record suggesting that LCRA made a representation that the final easement allowed TLCC the right to subdivide or place structures on the property other than boathouses, docks and piers.

## IMPLIED EASEMENT AND IMPLIED RESERVATION

Appellants claim next that they obtained an implied easement or implied reservation for exclusive use and occupancy of the property in question. Under these concepts they claim the right to maintain any convenient structure anywhere on the property. Appellants' claim is not meritorious.

An express easement is involved in this appeal. There is no implied easement incidental to the grant of the express easement except that which is reasonably necessary to the fair enjoyment of the express easement. *Coleman v. Forister*, 514 S.W.2d 899 (Tex.1974); *Wall v. Lower Colorado River Authority*, 536 S.W.2d 688 (Tex.Civ. App.1976, writ ref'd n. r. e.). The only right conferred upon appellants' predecessor in title by the easement was the right to use and occupy the land "... for the purpose of placing and maintaining thereon boathouses, piers and docks...." It is plain that it is not reasonably necessary that TLCC have the right to any type of structures it wished anywhere below the 715-foot contour line in order to fairly enjoy any boathouses, piers or docks. *Wall v. Lower Colorado River Authority, supra.*

Appellants rely upon *Ulbricht v. Friedsam*, 159 Tex. 607, 325 S.W.2d 669 (Tex.

1959), for the proposition that they hold an easement by necessity to use and occupy the property and to maintain any character of structure anywhere on the property. In *Wall v. Lower Colorado River Authority, supra,* this Court discussed *Friedsam*:

"In *Friedsam,* the grantor Linda Lou Friedsam, conveyed 386 acres out of a larger tract to Ulbricht, Heckman, and Prade. One side of the 386–acre tract was bounded by the 1020–foot contour line along the shores of Lake Buchanan. Ulbricht contended, *inter alia,* that he and others had the right to use the land below the 1020–foot contour line for certain purposes. The deed from Linda Lou Friedsam to Ulbricht '. . . contained no exceptions or reservations of any easements or rights of any kind or character . . .' "

"As we understand *Friedsam,* the Supreme Court recognized an easement by necessity in Ulbricht for the use and enjoyment of the land below the 1020–foot contour line."

*Friedsam,* of course, did not involve an express easement, as here, where the parties did consider and set out the specific easement rights that TLCC was to have.

Had the parties in this case not expressly agreed to their easement rights, the well-settled requirements for an implied grant or implied reservation of an easement still were not met. The use or easement right claim by implication (1) must be apparent and in existence at the time of the grant, (2) its use must have been continuous prior to the grant, and (3) its use must be necessary for use of the dominant estate. *Drye v. Eagle Rock Ranch, Inc.,* 364 S.W.2d 196 (Tex.1963). Appellants do not meet any of the three requirements of *Drye.* The apparent use of the property in existence on December 14, 1939, was for ranching, not for residences and clubhouses. Further, the use of the property for residential purposes and for clubhouses was not a continuous use in existence on December 14, 1939. Finally, the maintenance of buildings such as residences and clubhouses was not necessary for the enjoyment of boathouses, piers, and docks.

## AMBIGUITY

Appellants insist that the December 14, 1939, deed and easement are ambiguous, and, accordingly, summary judgment was improper since parol evidence as to the intention of the parties should have been admitted.

A writing is ambiguous only when the application of pertinent rules of interpretation to the face of the instrument indicates genuine uncertainty as to which one of two or more meanings is the proper one. *Universal C.I.T. Credit Corp. v. Daniel,* 150 Tex. 513, 243 S.W.2d 154 (1951). If there is no ambiguity, the construction of the writing is a question of law for the court. *Myers v. Gulf Coast Minerals Management Corporation,* 361 S.W.2d 193 (Tex. 1962). Generally, in the case of an unambiguous writing, the courts give effect to the intention of the parties as expressed by or as is apparent from the writing. In the usual case, the instrument alone will be deemed to express the intention of the parties for it is the objective, rather than subjective intent which controls. *City of Pinehurst v. Spooner Addition Water Co.,* 432 S.W.2d 515 (Tex.1968); *Wall v. Lower Colorado River Authority, supra.*

Appellants claim that the following phrases from the easement are ambiguous:

". . . a perpetual easement and right to use and occupy the land described hereinbelow for the purpose of placing and maintaining thereon boathouses, piers and docks . . . and use the same for boating, fishing and pleasure purposes . . ."

Appellants argue that a reasonable construction of that language permits them to place facilities in the property such as clubhouses, sheds, houses, sanitation facilities, and water and cooking facilities.

Appellants' contended construction is completely different from and greatly in excess of the limited rights that the parties chose to set out in the easement.

The extent of the easement granted TLCC is governed by the terms of the deed

and easement executed by TLCC and LCRA. A reading of the deed shows that LCRA obtained fee simple title to the land between the 670 and 715–foot contour lines. By the terms of the easement, the only right conferred upon TLCC was the right to build boathouses, piers and docks, and to use those structures for boating, fishing, and pleasure purposes. There was also conferred the right of ingress and egress. It is plain from the face of the instrument that the right to build residences, clubhouses, storage facilities, and like structures is not granted by the terms of the easement. *Universal C.I.T. Credit Corp. v. Daniel, supra.*

## ESTOPPEL, LACHES, ACQUIESCENCE, AND RATIFICATION

▮ Appellants claim that the district court erred in rendering summary judgment since the summary judgment "proof" established an issue of fact as to estoppel, laches, acquiescence, and ratification. As foundation for their claim, appellants rely, *inter alia*, upon the affidavits of W. R. Walker, Sam B. Stewart, and Artis Wilkerson.

Walker swore that in 1958, before he built a house on the subject property below the 715–foot contour line, he telephoned LCRA to be certain that LCRA had no objections. Walker talked to someone at LCRA who gave him the impression that the person had authority and knowledge to answer Walker's question. The unidentified person told Walker that LCRA had no objection, but that if the house were flooded, LCRA would not be responsible for the damages. LCRA later strung electric lines to the completed house.

Sam B. Stewart was president of CRGC in 1955. A that time the Club had under lease from R. E. Stevenson, a portion of the land in question and was contemplating its purchase. During the life of the lease, CRGC had already made substantial improvements on the land. Before making the purchase from Stevenson, the Board of Directors of CRGC instructed Stewart to inquire of LCRA "about the situation."

Stewart saw Sim Gideon whom Stewart understood to be the general manager of LCRA. According to Stewart, Gideon told him that he was familiar with the Club's operation. Gideon allegedly assured Stewart that if the Club purchased the land from Stevenson, it would have the exclusive use of the land in question when it was not inundated. LCRA would continue to honor the Club's occupancy of the property, and if the LCRA ever chose to sell the land, the adjacent landowners would have the first opportunity to purchase. Stewart stated that Gideon told him further to "let sleeping dogs lie."

Artis Wilkerson stated that while he was driving a bus in 1957, Sim Gideon told him that it was alright to build a house below the 715–foot contour line.

There was other summary judgment "proof" by way of deposition testimony and affidavits that most of the intervenors had paid property taxes on the respective parcels of land claimed and that LCRA had furnished electric service to several intervenors.

The record is clear that CRGC had placed improvements on the property before 1955, while under lease from Stevenson. It is also clear that none of the intervenors talked with LCRA concerning title to the property prior to their purchase.

Appellants argue that because of these statements and action by LCRA officials, they have acquired additional title or property rights in the land by estoppel so as to place any type of structure anywhere on the property.

For summary judgment purposes, this Court accepts as true the assertions in the above-mentioned affidavits. Even so, this Court is of the opinion the acts or conduct of the LCRA's officers and agents did not estop it from asserting fee title to the property.

▮ Appellants have not cited any authoritative cases, nor have we found any such precedent, where the State or a political subdivision has been divested of its rights in real property by a limitations,

estoppel, or acquiescence theory.[2] In fact, the established rule is to the contrary, to the effect that the State's interest in real property cannot be divested by estoppel, laches, adverse possession, dereliction, or by the acts or conduct of its officers or agents. *Texas Company v. State,* 154 Tex. 494, 281 S.W.2d 83 (1955); *Weatherly v. Jackson,* 123 Tex. 213, 71 S.W.2d 259 (1934); *Humble Oil and Refining Company v. State,* 162 S.W.2d 119 (Tex.Civ.App.1942, writ ref'd). To hold otherwise places a near impossible burden on the sovereign to police its lands.

 Furthermore, the general rule is that where a unit of government is exercising its governmental powers, it is not subject to estoppel or laches. *City of Hutchins v. Prasifka,* 450 S.W.2d 829 (Tex.1970). Entities such as water conservation and reclamation districts come within the general rule. *Lewis Cox & Son v. High Plains Underground Water,* 538 S.W.2d 659 (Tex. Civ.App.1976, writ ref'd n. r. e.). This Court has held that the storage and distribution of flood waters by LCRA is a governmental function. *Karling v. Lower Colorado River Authority,* 303 S.W.2d 495 (Tex. Civ.App.1957, writ ref'd n. r. e.). The purchase of the subject property by LCRA was for the purpose of furthering the governmental function of storing and distributing flood waters, and was made necessary by the construction of Mansfield Dam.

An exception to the general rule is made in those cases where justice requires that a municipality be estopped and there is no interference with the exercise of the municipality's governmental functions. But such doctrine is applied with caution and only in exceptional cases where the circumstances clearly demand its application to present manifest injustice. *City of Hutchins v. Prasifka, supra.* The Supreme Court applied such exception in *Roberts v. Haltom City,* 543 S.W.2d 75 (Tex.1976), by holding that a city, by conduct of its agents, was estopped to assert as a defense a claim-ant's failure to give written notice of injury as required by the city charter.

In the case at bar, we are not concerned about a matter of procedure as was involved in *Haltom City.* Appellants, being unable to show the existence of their claimed legal rights and title, seek to invoke the doctrine of estoppel to effectively divest LRCA of its rights in real property and create in themselves real property interests that would not otherwise exist. *Haltom City* is not authority for that proposition.

As previously written, our research reveals no precedent in this State for application of estoppel or appellants' other equitable theories to real property interests of the State. Further, we know of no Texas case applying the *Haltom City* exception to the State as distinguished from municipalities. Appellants' contention is overruled.

Appellants have other points of error most of which are predicated upon the proposition that they hold greater interests in the concerned property than they had. The remaining points are overruled.

The judgment is affirmed.

POWERS, J., not sitting.

---

**2.** We do not read *State v. Galveston City Co.,* 38 Tex. 12 (1873), to stand for the proposition urged by appellants. Moreover, that opinion being decided by the Reconstruction Court is not regarded as authoritative. *Taylor v. Murphy,* 50 Tex. 291 (1878); *Peck v. San Antonio,* 51 Tex. 490 (1879).